**METRO CABLE CO., a Delaware Corporation, Plaintiff-Appellant,**

v.

**CATV OF ROCKFORD, INC., an Illinois Corporation, et al., Defendants-Appellees.**

No. 74–1492.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1974.

Decided April 2, 1975.

Richard M. Calkins, Chicago, Ill., for plaintiff-appellant.

George L. Saunders, Jr., Chicago, Ill., for defendants-appellees.

Before STEVENS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

This action under the Sherman Act (15 U.S.C. §§ 1, 2) arises out of plaintiff's inability to obtain a franchise from the City of Rockford, Illinois, to construct and operate a cable television transmission system within that city. The defendants are the company that did obtain a franchise; its affiliate which operates television broadcasting channel WCEE–TV in Rockford; four individuals who are officers or directors and, with one exception, stockholders of the latter company and also stockholders and, with one exception, officers of the former; and the mayor and an alderman of the city. The District Court granted defendants' motion to dismiss the second amended complaint, Metro Cable Co. v. CATV of Rockford, Inc., 375 F.Supp. 350 (N.D.Ill.1974), basing its action on the *Noerr-Pennington* doctrine (Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). We affirm.

The following is a synopsis of plaintiff's arguably material allegations, with some of the pejorative matter expressed in more concrete words: [1]

Plaintiff operates a cable television transmission system in two small incorporated communities and in unincorporated areas in Winnebago County, Illinois. It receives television signals from the three local television stations in Rockford, the county's principal city, and from other, more distant television stations by means of antenna mounted on a high tower and distributes these signals by cable to subscribers, who pay monthly fees for this service. Defendant Rock River Television, Inc. operates one of the three local stations, Channel WCEE–TV (and will be referred to as "WCEE–TV"), which began broadcasting in September, 1965. WCEE–TV and its stockholders organized defendant CATV of Rockford, Inc. (hereinafter "CATV") to obtain a franchise and operate a cable

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. A detailed recital of the allegations may be found in the District Court's opinion, 375 F.Supp. at 352–356.

television transmission system within the City of Rockford.

By an agreement which had its inception in 1964 or 1965, the defendants[2] have undertaken to prevent plaintiff from operating a cable television system in Rockford. The result of the agreement has been to give CATV a monopoly of cable television in that city, and, concomitantly to prevent plaintiff from delivering any television signals in that city in competition with WCEE–TV.

WCEE–TV participated in the conspiracy in order to prevent further competition in the television market in Rockford. CATV was formed so it could obtain a cable television franchise and prevent plaintiff from obtaining a franchise. WCEE–TV retained control of CATV after the latter received the only franchise granted by the city, enabling WCEE–TV to determine when and in what areas cable TV would be introduced in Rockford. The two companies have been under common control and have had the same management.

In 1965 and 1966 defendant Schleicher, mayor of the city, defendant Skolrood, an alderman who was chairman of the city council's Planning and Finance Committee, "and other parties as yet unknown" agreed with two of the corporate-officer defendants to use their best efforts to prevent plaintiff from getting a franchise, and "in exchange" each official was given "a substantial sum" as a campaign contribution.[3]

In April, 1966, the city council's License Committee recommended that plaintiff be granted a cable television franchise, but nine days later the council awarded the franchise to CATV "because of pressure brought on the Council by defendant Schleicher" acting pursuant to the agreement just described.

Plaintiff made a second application in October, 1970, and supported its application with a deposit of $100,000 to guarantee its promise to start construction promptly and an opinion of "independent" counsel that the city could not grant an exclusive franchise. Schleicher and Skolrood "refused to grant plaintiff even a hearing on its petition." (It is not alleged that no hearing was held by the city council or any of its committees, but we assume that to be the fact.) In addition, two of the corporate-officer defendants wilfully misrepresented to the council's Planning and Finance Committee that CATV had bought land and constructed an antenna tower, whereas in fact it was WCEE–TV that had done so. Skolrood, who was a member of the committee (apparently he was no longer chairman), knew this was a misrepresentation.

A third application was submitted by plaintiff in September, 1971. This time an assistant city attorney rendered an opinion that the city had no right to grant an exclusive franchise to CATV. The city council nevertheless refused to grant a hearing on the application. Sometime thereafter the Planning and Finance Committee (of which Skolrood apparently was again chairman) appointed a subcommittee to establish hearing procedures to be followed in awarding a second franchise, but the subcommittee secretly decided to do nothing and to allow only CATV to operate cable television in the city. Skolrood was a member of this subcommittee.

In 1972 Skolrood "voted" (it is not alleged in what capacity or under what circumstances) not to grant additional franchises in the city. In the same year Mayor Schleicher executed a certificate filed with the Federal Communications Commission to the effect that a public

---

**2.** This general allegation is later qualified by allegations that the mayor and the alderman became members of the conspiracy in 1965 or 1966, subsequent to its formation.

**3.** In the original complaint, plaintiff alleged that CATV had granted one of the corporate-officer defendants, Swanson, an option to purchase 2,000 shares of capital stock of CATV, and that Swanson held the option but refused to make known its beneficial owners. This allegation does not appear in the second amended complaint.

proceeding was held by an appropriate committee of the city council as required by FCC regulations when in fact no such proceeding was held.

In 1972 plaintiff wanted to extend its cable system to serve some institutions and homes in unincorporated areas of the county. To reach these potential subscribers, it would have had to erect its cables on utility poles within the city's corporate limits. The city refused to permit this "as a result of the influence of" Schleicher and Skolrood and a misrepresentation by a corporate-officer defendant that Illinois Bell Telephone Company had lines that would be available for plaintiff's use.

Injunctive relief and damages, in the amount of $3,000,000 trebled, are sought.

In substance, then, plaintiff alleges that WCEE–TV and its officers planned to obtain the exclusive cable television franchise in Rockford; organized a company, CATV, for that purpose; induced the mayor and an alderman to oppose plaintiff's application by making a campaign contribution to each of those officers; and succeeded, with the help of the mayor and the alderman, in persuading the city council not only to award the franchise to CATV but to refuse plaintiff's successive applications without affording plaintiff a hearing.

### I.

In judging the sufficiency of the allegations of the complaint, as amended, we are governed by the series of Supreme Court decisions beginning with Eastern Railroad Presidents Conference v. Noerr, *supra*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. An analysis of those cases is the starting point for our decision.

### A.

In *Noerr* Mr. Justice Black, writing for a unanimous Court, held that concerted conduct to induce or to influence public officials to pass or enforce laws is not forbidden by the Sherman Act, regardless of its anticompetitive purpose or effect and regardless of attendant mis-

representations characterized as unethical conduct. That case involved a campaign by a group of railroads to persuade legislative and executive branches of state governments to take action injurious to truckers who were competitors of the railroads for long-haul freight business.

The Court's reasoning in overturning a judgment in favor of the truckers was in substance as follows: Restraint of trade or monopolization that is the result of otherwise valid governmental action does not violate the Sherman Act. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). Given that proposition and the importance in a representative democracy of freedom in the people to communicate their wishes to their representatives, genuine efforts to induce government to take such lawful action are also beyond the Sherman Act. That Congress did not intend that Act to apply to agreements to seek legislation or law enforcement, as opposed to agreements inhibiting "trade freedom," is inferable from the dissimilarity between the two kinds of agreements and confirmed by the effect a contrary construction would have on the operation of a representative democracy: It would impair the power of government to take actions that restrain trade and also raise important constitutional questions, of which one is the right of petition. "For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." (365 U.S. at 136–138, 81 S.Ct. at 530.)

The Court then proceeded to decide that "the presence in the railroads' publicity campaign of additional factors" did not "take the case out of the area in which the principle is controlling," (*id.* at 138, 81 S.Ct. at 530) holding as follows: The legality of the railroads' campaign to obtain governmental action was not

affected by the fact that their sole purpose in seeking passage of legislation was to destroy the truckers as competitors for long-haul freight business. "Unethical business conduct" by the railroads in that publicity campaign, consisting of misrepresentations of the sources of opinions and information was irrelevant so far as the Sherman Act was concerned. Nor did the infliction of direct injury upon the truckers, incidental to the railroads' campaign to influence governmental action but nevertheless intended by the railroads, make the railroads' conduct unlawful, for to hold otherwise would "be tantamount to outlawing all such campaigns." (*Id.* at 143–144, 81 S.Ct. at 533.)

Finally, the Court stated what has come to be known as the "sham exception" to the *Noerr* rule. To be immune, the concerted conduct must be a genuine effort to influence governmental action and not "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." (*Id.* at 144, 81 S.Ct. at 533.)

### B.

United Mine Workers of America v. Pennington, *supra*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, applied the *Noerr* rule to concerted action to influence public officials which was part of a broader scheme that itself violated the Sherman Act. In that case the United Mine Workers of America and certain large coal operators had combined to induce the Secretary of Labor[4] and the TVA[5]

to take action injurious to small coal operators. The Court held,

"Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." (*Id.* at 670, 85 S.Ct. at 1593.)

### C.

The concerted action in both *Noerr* and *Pennington* was aimed at influencing either the legislative branch or the executive branch acting in a non-adjudicatory capacity. The debate over whether the doctrine of those cases applied to adjudicatory functions of administrative agencies and to judicial proceedings was stilled by California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1971), which held that it did,[6] but that it had to be "adapted" when applied in an adjudicatory setting.

The issue before the Supreme Court in *California Motor Transport* was the legal sufficiency of a complaint which alleged that certain California truckers had formed and carried out a conspiracy to deter their competitors from seeking new or expanded operating rights before the California Public Utilities Commission and the Interstate Commerce Commission by opposing every application, regardless of the merits. The alleged result "was that the machinery of the agencies and courts was effectively closed" to the plaintiffs. (404 U.S. at

---

**4.** The action sought and obtained was establishment under the Walsh-Healey Act, as amended, 41 U.S.C. § 35 et seq., of a minimum wage for employees of companies selling coal to the TVA.

**5.** "[T]he TVA was urged to curtail its spot market purchases, a substantial portion of which were exempt from the Walsh-Healey order." (381 U.S. at 660–661, 85 S.Ct. at 1588.)

**6.** Commentators and courts have disagreed about the implications of that decision. *Compare, e. g.*, Handler, Twenty-Five Years of An-

titrust, 73 Colum.L.Rev. 415, 430–439 (1973), Jacobs, Regulated Motor Carriers and the Antitrust Laws, 58 Cornell L.Rev. 90, 108–113 (1972), *and* Note, The Quagmire Thickens: A Post-California Motor View of the Antitrust and Constitutional Ramifications of Petitioning the Government, 42 U.Cin.L.Rev. 281, 301–316 (1973), with Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272, 278–279 (1972), Rodgers v. F. T. C., 492 F.2d 228, 231–232 (9th Cir. 1974), cert. denied, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974), and Semke v. Enid Auto. Dealers Ass'n, 456 F.2d 1361, 1365–1367 (10th Cir. 1972).

511, 92 S.Ct. at 612.) To finance these activities, a fund was established to which each defendant contributed in proportion to its gross income. The defendants informed their competitors that this fund would be used to finance opposition to every application then pending or subsequently filed, regardless of its merits, that in every case the opposition would be pursued through all stages of administrative and judicial review, and that the only way the competitors could avoid the expense and delay caused by the defendants' opposition would be to abandon pending applications and severely limit or refrain from filing further applications.[7]

The Supreme Court, in an opinion by Mr. Justice Douglas, held that while *Noerr* applied to concerted action to influence adjudicatory action, plaintiffs had alleged a case that fell within the sham exception. (404 U.S. at 511–516, 92 S.Ct. 609.) The conduct alleged was not a genuine effort to influence public officials, which is what *Noerr* and *Pennington* immunized. The opposition to applications was a sham, being an element in the defendants' program to deter competitors from prosecuting applications, as a result of which the governmental bodies were never given the opportunity to consider those applications.

While stating that the *Noerr-Pennington* doctrine applies in an adjudicatory setting (*id.* at 510–511, 92 S.Ct. 609), Mr. Justice Douglas's opinion goes on to say that unethical conduct that may be tolerated in a political context may result in sanctions in an adjudicatory context. (*Id.* at 512–513, 92 S.Ct. 609.) After stating as examples perjury and the use of a patent obtained by fraud to exclude a competitor from the market, which may be an anti-trust violation (citing Walker Process Equipment, Inc. v. Ford Machinery & Chemical Corp., 382 U.S. 172, 175–177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)), the opinion goes on to say:

> "Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 [(1961)];[8] Harman v. Valley National Bank, 339 F.2d 564 (CA9 1964)." (*Id.* at 513, 92 S.Ct. at 613.)

In the *Continental Ore* case, the conspirators included a corporation that was a subsidiary of a principal conspirator and was also acting as a licensing agent of the Canadian government. (370 U.S. at 695, 82 S.Ct. 1404.) While the case does not appear to involve an adjudicatory setting, neither does it involve a political setting. In the *Harman* case, the Ninth Circuit held a complaint sufficient under the Sherman Act which alleged that the defendants had induced the Attorney General of Arizona, who was alleged to be a co-conspirator, to file an unfounded but successful suit to have a receiver appointed for a savings and loan association as part of a larger scheme to monopolize the industry. (339 F.2d at 566.)[9]

Mr. Justice Douglas then goes on to say:

> "There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the

---

**7.** See the opinion of the Court of Appeals in the case, Trucking Unlimited v. California Motor Transport Co., 432 F.2d 755, 762 (9th Cir. 1970).

**8.** Compare footnote 4 in *Pennington*, 381 U.S. at 671, 85 S.Ct. at 1594, which distinguished *Continental Ore* as "wholly dissimilar to both *Noerr* and the present case."

**9.** Mr. Justice Douglas concluded this paragraph of the *California Motor Transport* opinion by stating,

> "Similarly, bribery of a public purchasing agent may constitute a violation of § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act. Rangen, Inc. v. Sterling Nelson & Sons, 351 F.2d 851 (CA9 1965), [cert. denied, 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966)]." (404 U.S. at 513, 92 S.Ct. at 613.)

adjudicatory process." (404 U.S. at 513, 92 S.Ct. at 613.)

While the assertion in an adjudicatory process of a claim or defense that an opponent or the court or agency itself may think baseless will not ordinarily result in sanction, "a pattern of baseless, repetitive claims" may amount to abuse of process producing the illegal result of barring opponents from access to agencies and courts. "Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" (*Id.* at 513, 92 S.Ct. at 613.)

Finally, the Court said:

"On their face the above-quoted allegations come within the 'sham' exception in the *Noerr* case, as adapted to the adjudicatory process." (*Id.* at 516, 92 S.Ct. at 614.)

In the course of the opinion, the Court rejected the defendants' argument that the First Amendment protected their conduct, holding that speech or petition which is an integral part of conduct that violates a valid statute is not protected. (*Id.* at 513–515, 92 S.Ct. at 609.) Mr. Justice Stewart, joined by Mr. Justice Brennan, while concurring in the result because the real intent alleged was not to invoke governmental processes but to prevent the plaintiffs from invoking those processes, took exception to the Court's First Amendment discussion, asserting that the Court "retreats from *Noerr* and in the process tramples upon important First Amendment values." (*Id.* at 516, 92 S.Ct. at 614.) [10]

## D.

The Supreme Court's latest application of the *Noerr-Pennington* doctrine was in Otter Tail Power Co. v. United States, 410 U.S. 366, 379–380, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), a government civil antitrust suit in which the district court, in an order entered before the Supreme Court's decision in *California Motor Transport*, held that *Noerr* did not apply to litigation sponsored by the defendant having anticompetitive effects, because *Noerr* applied "only to efforts aimed at influencing the legislative and executive branches of the government." United States v. Otter Tail Power Co., 331 F.Supp. 54, 62 (D.Minn.1971). The Supreme Court vacated and remanded on that phase of the order for further consideration in light of *California Motor Transport*. (410 U.S. at 380, 92 S.Ct. 609.) The dissenting justices concurred in this part of the majority opinion. (*Id.* at 382, 92 S.Ct. 609.)

## E.

This line of Supreme Court decisions may be synthesized as follows:

The Sherman Act does not apply to otherwise valid governmental action that results in a restraint of trade or monopoly. Parker v. Brown. Nor does the Sherman Act apply to concerted efforts to induce government to take such lawful action, if those efforts are genuine. *Noerr*. Such efforts constitute political activities which Congress did not intend to regulate by the Sherman Act. This is true even though the purpose and effect of the concerted activi-

---

**10.** Professor Handler has pointed out, Handler, *supra* note 6, 73 Colum.L.Rev. at 435 n. 142, that *Noerr* discussed First Amendment considerations as indicative of Congress's intent, but did not reach the constitutional question. Mr. Justice Black stated in that connection:

"A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the peo-

ple of their right to petition in the very instances in which that right may be of the most importance to them. We reject such a construction of the Act . . . ." (365 U.S. at 139, 81 S.Ct. at 530.)

Mr. Justice Douglas's opinion in *California Motor Transport,* however, views *Noerr* as bottomed upon the First Amendment and "[i]n so doing, he elevates *Noerr* to the status of a constitutional principle." Handler, *supra*, 73 Colum.L.Rev. at 435.

ties is to eliminate competition. *Noerr; Pennington.* When the concerted activities occur in a legislative or other non-adjudicatory governmental setting, they are not within the Sherman Act even though they include "conduct that can be termed unethical," such as deception and misrepresentation. *Noerr; Pennington.* This is true even when the concerted efforts are "part of a broader scheme itself violative of the Sherman Act." *Pennington.* When, however, the concerted activities occur in an adjudicatory setting, unethical conduct that would not result in antitrust illegality in a legislative or other non-adjudicatory setting may demonstrate that the defendants' activities are not genuine attempts to use the adjudicative process legitimately and may therefore result in illegality, including illegality under the antitrust laws. (This is "the 'sham' exception in the *Noerr* case, as adapted to the adjudicatory process." 404 U.S. at 516, 92 S.Ct. at 614.) *California Motor Transport.*

## II.

We must take the Supreme Court at its word when it reaffirms the authority of *Noerr* in the *California Motor Transport* opinion. Whatever the significance of the citation of *Harman*[11] in *California Motor Transport's* discussion of why unethical conduct may not be immune in an adjudicative, as opposed to a political, setting, that discussion is not applicable here, for the Rockford City Council was a legislative body, acting as such, and the conduct challenged here thus occurred in a political setting.

### A.

■ The city council is a body to which the Illinois General Assembly has delegated some of the legislative powers of the state. See Art. 11, Ch. 24, Ill.Rev. Stat. The council need not, as a prereq-

uisite to taking action, compile an evidentiary record through formal proceedings. It is free to base its actions on information and arguments that come to it from any source. As a legislative body, it and its committees operate in a political setting. Its members are subject to lobbying and other forms of ex parte influence which *Noerr* recognized are a part of the political process and means by which the people are entitled to communicate with their representatives.

The mayor is an executive officer with some legislative duties, which include presiding over the city council and voting when the aldermen are equally divided. Ill.Rev.Stat., Ch. 24, § 3–11–14. Like the city council, the mayor carries out his duties in a political rather than adjudicatory setting.

When the city council exercises its authority to franchise or refrain from franchising cable television systems, it still acts as a legislative body, since that is the only way it is organized and equipped to act. The franchising or licensing function could have been delegated to an administrative tribunal, in which case that function would presumably have been performed in an adjudicatory setting. Instead the function was left to and retained by a legislative body equipped to act only as a legislative body.

### B.

■ That the actions of the Rockford City Council in granting a franchise to CATV and refusing a franchise to plaintiff were not violative of the Sherman Act is conceded by plaintiff. Illinois law gave the city council authority to grant franchises for cable television, and implicitly, the authority to determine whether one or more than one applicant should be franchised. Ill.Rev. Stat., ch. 24, § 11–42–11.[12] Even though

---

11. 339 F.2d 564, discussed in Part I, C, *supra.*

12. Ill.Rev.Stat., Ch. 24, § 11–42–11, in its relevant part, states:

"The corporate authorities of each municipality may license, franchise and tax the

business of operating a community antenna television system as hereinafter defined."
The term "franchise" seems more accurately than the term "license" to describe the authority given to CATV by the ordinance. The terms "license" and "franchise" are sometimes

the council's actions gave CATV a monopoly of cable television in Rockford and restrained plaintiff from competing in Rockford, those actions did not themselves violate the Sherman Act.

■ Since the governmental actions of the city council and its committees were not themselves subject to the Sherman Act, the same was true under *Noerr* of concerted efforts to induce those governmental actions, even though those efforts had the anticompetitive purpose and effect alleged by plaintiff, if those efforts were genuinely aimed at inducing the governmental actions and were not a pretext for inflicting on plaintiff an injury not caused by any governmental action. Unlike the injury to plaintiffs in *California Motor Transport*, the injury to plaintiff in the case at bar was caused by the governmental actions of the city council which the defendants genuinely and successfully attempted to induce the city council to take.

## C.

■ Plaintiff's allegations that the mayor and an alderman were brought into the conspiracy do not take the case outside the *Noerr* doctrine. We find nothing in the Supreme Court's decisions, to which we must first look, that indicates a contrary result. This is not a case in which the agency of government itself is alleged to be a part of the conspiracy, the question reserved in Parker v. Brown, *supra*. (317 U.S. 351–352, 63 S.Ct. 307.) The Court did say in *Pennington*, in holding that damages flowing from the action of the Secretary of Labor were not recoverable, that his action "was the act of a public official who is not claimed to be a co-conspirator." (381 U.S. at 671, 85 S.Ct. at 1594.) Then, in a footnote, however, the Court clarified this observation by comparing and distinguishing the *Continental Ore*

case, *supra*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777, noting that there the purchasing agent appointed by the Canadian Government "was not a public official but the wholly owned subsidary of an American corporation alleged to be the principal actor in the conspiracy," and had acted on directions of its parent and not the Canadian Government. (381 U.S. at 671 n. 4, 85 S.Ct. at 1594.)

A public official was named as co-conspirator in Harman v. Valley National Bank, *supra*, 339 F.2d 564, which, with *Continental Ore*, was cited by Mr. Justice Douglas in his passage on unethical conduct in adjudicatory settings in *California Motor Transport*. (404 U.S. at 513, 92 S.Ct. 609.) In *Harman* the court distinguished *Noerr* on two grounds: (1) the joint effort to influence the Attorney General of Arizona to bring a baseless suit to put a financial institution in receivership was part of a larger scheme, and (2) the Attorney General was alleged to be a co-conspirator. (339 F.2d at 566.) No explanation of either distinction was given. The Supreme Court, of course, abrogated the first distinction in *Pennington*, decided after *Harman*. The Ninth Circuit, noting that *Harman's* authority had been "eroded" by *Pennington*, declined to follow *Harman* in Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 342 (9th Cir. 1969). The allegations in *Sun Valley* were similar to those at bar: a conspiracy to obtain an exclusive garbage pickup and disposal franchise from the county, resulting in destruction of plaintiff's business, with some of the county commissioners alleged to be participants in the conspiracy. In upholding a summary judgment for defendants and refusing to follow *Harman*, the court, relying upon *Noerr*, said:

" . . . local governmental units such as city councils and county boards

used interchangeably by the Illinois courts. See, *e. g.*, General Electric Cablevision Corp. v. City of Peoria, 8 Ill.App.3d 948, 951, 291 N.E.2d 295, 298 (3d Dist. 1972). Both plaintiff and defendants concede that the franchise or

license in question was non-exclusive in the sense that the municipality was free to grant additional franchises to others if it chose to do so.

are seldom completely free from personal interest and outside influences, but the Sherman Act was not intended to regulate this type of activity." (420 F.2d at 342.)

The concurring judge, noting the statement in *Pennington* that the public official was "not claimed to be a co-conspirator" (381 U.S. at 671, 85 S.Ct. at 1594), thought that, had there been substantial evidence of participation by the commissioners in the conspiracy, this would have been enough to bring the case within the Sherman Act. (420 F.2d at 344.) The majority did not address this question.

In Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272 (1972), one of the defendants was an official of the Food and Drug Administration, but the court did not indicate whether this was relevant in a *Noerr* analysis. (*Id.* at 274, 275–276 n. 6.) [13] The case is distinguishable from the case at bar in other respects, since it involved a quasi-adjudicative rather than a legislative setting and the court viewed the complaint as alleging that the real purpose of defendants was "to preclude, not induce, fair FDA consideration of the safety and efficacy of plaintiff's drug" (*id.* at 279), thus bringing the case within the sham exception.

In the case at bar, the allegations on the basis of which the defendant mayor and alderman are said to have been co-conspirators are that they were persuaded by two members of the public, who are also defendants, to support the CATV application and to oppose plaintiff's application, and that they were given campaign contributions "in exchange" for this undertaking. These allegations do not take the case outside the protection of the *Noerr* doctrine. Plaintiff's position is in essence that an agreement to attempt to induce legislative action is a "conspiracy," and that if

some of the "conspirators" persuade a member of the legislative body to agree to support their cause, he becomes a "co-conspirator" and a Sherman Act violation results. Such a rule would in practice abrogate the *Noerr* doctrine. It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became such "co-conspirators." A holding that participation by members of the legislative body to the extent alleged here rendered the *Noerr* doctrine inapplicable to a campaign to induce legislative action, would, like a holding "that the knowing infliction of . . . injury renders the campaign itself illegal . . . [,] be tantamount to outlawing all such campaigns." Cf. *Noerr*, 365 U.S. at 143–144, 81 S.Ct. at 533.

Moreover, we can find no rational basis in the authorities or plaintiff's argument for holding that such participation by a member of the legislative body as is here alleged should cause the Sherman Act to apply to an effort to induce governmental action that is otherwise protected by *Noerr*. Nothing in the *Noerr* opinion or any other case of which we are aware suggests any reason for believing that Congress, not having intended the Sherman Act to apply to combined efforts to induce legislative action, did intend the Act to apply if a member of the legislative body agreed to support those efforts.

## D.

■ The allegations concerning the giving of "substantial" [14] sums to the mayor and and an alderman as campaign contributions in 1965 or 1966 do not bring within the Sherman Act conduct that is otherwise excluded from the Act's coverage by the *Noerr* doctrine. Campaign contributions are, whether we

---

13. The court left open the possibility of an official immunity defense for this defendant. (466 F.2d at 275 n. la.)

14. The District Court notes that the depositions show that the substantial sums amount-

ed to $50. (375 F.Supp. at 357 n. 2.) Since the case is here on a motion to dismiss, we of course assume the allegations of the complaint are true.

like it or not, a part of the political process. When Congress has chosen to prohibit or regulate them, it has done so directly. See Federal Election Campaign Act of 1971, 2 U.S.C. § 431 et seq.; 18 U.S.C. § 591, et seq. Although the Supreme Court in *Noerr* did not discuss campaign contributions, the district court in that case, affirmed by the court of appeals, found that the truckers had made campaign contributions as a part of their counterattack against the railroads, and that this conduct, although regrettable, did not render the truckers' actions violative of the Sherman Act.[15] The railroads were found by the district court to have planned "to aid financially and in every other way legislators disposed to the railroads' point of view,"[16] and, through their agent, to have spent money working "in close liaison with public officials" and lavishly entertaining them.[17] Clearly, allegations concerning campaign contributions do not convert into a Sherman Act violation conduct which *Noerr* held was not covered by the Act. We do not condone the giving or acceptance of campaign contributions as inducements to support the donor's interests in the legislative process. We merely hold that this conduct was not intended to be covered by the Sherman Act.

### E.

The defendants' use of misrepresentations as a part of their efforts to induce governmental action does not bring their conduct within the Sherman Act. In *Noerr* the railroads were guilty of "unethical business conduct," consisting of misrepresentations, express and implied, designed to deceive the public and governmental officials. (365 U.S. at 140–142, 81 S.Ct. 523.)

### F.

In oral argument, plaintiff's counsel stated that the refusal to hold a hearing is the essence of this case. This position is amplified in plaintiff's brief, where it states:

> "The acts or conduct of the defendants to influence the City Council either to change its policy of non-exclusivity or to oppose the grant of a license to a potential competitor once the competing applicant's petition had reached the council for consideration and a hearing is not the gravamen of this suit, for such conduct would admittedly be protected."

By "policy of non-exclusivity" plaintiff apparently means the alleged decision by the committee of the council to appoint a subcommittee to establish a procedure for processing further license applications. Plaintiff goes on to say that what it complains of is conduct that denied it "access to the licensing body," thereby "subverting [an] established policy of non-exclusivity." Later in its brief plaintiff says,

> ". . . plaintiff is not complaining about the grant of a non-exclusive license to the defendant CATV of Rockford even though procured by illegal means. Plaintiff's complaint concerns the City Council's refusal to hold a hearing on plaintiff's license application."

Plaintiff thus acknowledges the continuing force of *Noerr* and attempts to bring its case within *California Motor*

---

**15.** Noerr v. Eastern Railroad Presidents Conference, 155 F.Supp. 768, 802 (E.D.Pa.1957), aff'd, 273 F.2d 218 (3d Cir. 1959). This evidence was offered in support of the railroads' counterclaim, which was not before the Supreme Court because the railroads did not seek review by certiorari of the adverse decision on the counterclaim. The trial court did find, however, that over the years the truckers contributed sizable sums as campaign contributions to political parties at the county (155 F.Supp. at 802) and state level (*id.* at 804).

**16.** This was one of the ten fundamental objectives of the railroads' plan. (155 F.Supp. at 810.)

**17.** "The record indicates beyond peradventure of doubt that Byoir [the public relation firm employed by the railroads] using railroad money worked in close liaison with public officials, lavishly entertained them at the expense of the railroads, and used them as dupes in the railroad campaign against truckers." (155 F.Supp. at 806.)

*Transport* by arguing that it was denied access to the city council by the refusal of the council and its committee to hold hearings on any of plaintiff's three applications. In *California Motor Transport*, however, the defendants were alleged to have engaged in conduct that was not genuinely aimed at securing favorable governmental action but at discouraging competitors from seeking governmental action. That conduct, therefore, as the Supreme Court expressly stated, fell "within the 'sham' exception in the *Noerr* case, as adapted to the adjudicatory process." (404 U.S. at 516, 92 S.Ct. at 614.) In the case at bar, there is no conceivable basis for arguing that defendants' conduct was a sham rather than a genuine effort to influence legislative action. Plaintiff's injury was caused by the governmental action which defendants genuinely attempted to secure and succeeded in securing. In *California Motor Transport* the plaintiffs' injury was caused, not by governmental action, but by defendants' sham activities.

Even if the sham character of defendants' conduct in *California Motor Transport* is ignored, and the case is treated as if it concerned only denial of access to a governmental body, plaintiff's reliance upon it must fail. That case, it must once more be remembered, involved an adjudicatory setting, in which governmental action is taken by means of a highly structured procedure before a body that can act only on the basis of a record made at hearings. The allegations were that access to that procedure, and hence to the governmental body empowered to act, was shut off. There are no comparable allegations here. The most that is alleged is that the city council's committees were persuaded not to hold hearings. But access to a legislative body is not shut off by its failure to hold hearings. Neither the council nor any of its committees was constrained by any requirement that they act on the basis of a record made at hearings.[18] Illinois law contained no such requirement. Access to a legislative body does not depend, therefore, on whether formal hearings are held. It may be gained through informal means that were open to plaintiff and defendants alike. The complaint contains no allegations that defendants attempted to preclude plaintiff from communicating with the aldermen or with the constituents of the aldermen, from petitioning the council, or from supporting their requests through the media. Allegations that the council or its committees did not hold hearings do not amount to allegations of effective denial of access to the city council.

G.

The allegation that the mayor filed a false certificate with the FCC has no Sherman Act significance, since no action of the FCC caused injury to plaintiff. Nor does the allegation that the city was persuaded by certain defendants to refuse plaintiff permission to erect cables on utility poles within the city limits in order to reach prospective subscribers in an area outside the city limits. In denying that permission, the city council was still a legislative body, acting as such.

III.

In one respect, the second amended complaint may arguably be read to state a violation of the Sherman Act, but it appears that plaintiff was not injured in its business or property by that violation. Counsel for plaintiff suggested in oral argument that paragraphs 15 and 16 of that pleading can be read to allege that defendants formed a plan to block any cable television in Rockford that would compete with WCEE–TV,

---

18. The FCC regulations to which plaintiff refers, 47 C.F.R. § 76.31 (1973), were adopted almost six years after the city council granted a franchise to CATV and denied plaintiff's first application, an unstated length of time after denial of plaintiff's second application, and some five months after plaintiff's third application was filed. The date of rejection of the third application is not alleged. The regulations require only that a record be made to support an application that has been allowed. They do not require that every applicant be given a hearing.

and that CATV was organized to obtain the cable television franchise from the city and then, having secured what was in effect an exclusive franchise, to delay building cable facilities in order to postpone the day when WCEE–TV would have competition from cable television. Accepting this reading for present purposes, an overall plan to violate the Sherman Act would be alleged. The part of that overall plan that consisted of inducing the city council to grant CATV a franchise and to refuse plaintiff a franchise is not, however, within the Sherman Act (United Mine Workers of America v. Pennington, *supra*, 381 U.S. at 670, 85 S.Ct. 1585), and damages flowing from that conduct are therefore not recoverable. Any person who suffered injury by reason of the delay in establishing a cable television system in Rockford, for example, a distant television station which could only reach Rockford consumers through cable television facilities, would be entitled to recover under the Sherman Act for that injury. These allegations do not, however, show injury to plaintiff and therefore do not state a claim upon which relief can be granted to plaintiff.

Affirmed.