Urban Products International, Ltd., Plaintiff-Appellant, v. National Disposal Service. et al., Defendants-Appellees.

(No. 60999; ▮▮▮▮▮▮)

First District (1st Division)—September 15, 1975.

Parrillo, Bresler, Weiss & Moss, of Chicago (Robert Parrillo, of counsel), for appellant.

Joseph V. Giffin and Champ W. Davis, Jr., both of Chadwell, Kayser, Ruggles, McGee & Hastings, of Chicago, for appellees.

Mr. JUSTICE SIMON delivered the opinion of the court:

The plaintiff, Urban Products International Ltd., was an unsuccessful applicant for a 5-year contract to pick up refuse for the village of Wilmette. The plaintiff sued for damages resulting from defendants' alleged violations of the Illinois Antitrust Act (Ill. Rev. Stat. 1971, ch. 38, § 60—1 et seq.), which it claimed prevented it from obtaining this business. Summary judgment was granted in favor of the defendants.

The issues raised by plaintiff's appeal are: Whether there was any genuine issue of material fact with respect to the reason for the village's rejection of plaintiff's offer; and whether the defendants' revision of their offer to the village reducing their price below the plaintiff's violated

section 3(4) of the Illinois Antitrust Act. We conclude after considering both issues that entry of summary judgment was proper.

Defendant, National Disposal Service, Inc. ("National"), through a subsidiary, was providing refuse pickup service for the village under a 5-year contract which was nearing its expiration. Defendant Browning-Ferris Industries was National's parent corporation, but did not itself engage in refuse collection in Illinois. The village solicited bids for a contract for pickup service for a 5-year period commencing May 1, 1972, and two sealed bids were submitted in compliance with the solicitation, one by the plaintiff and the other by National. The plaintiff's bid was approximately $74,000 per year lower than National's whose bid was approximately $150,000 per year higher than the amount it was receiving under the existing contract. Both bids were rejected by the village trustees, and subsequently the village contracted with National at a price slightly below the plaintiff's bid.

Neither plaintiff nor its officers or directors had ever conducted a garbage pickup business. Plaintiff had no relationship to any other corporation or business which had engaged in similar ventures. Andrew Theodorou, an employee of plaintiff, was to be placed in charge of the Wilmette refuse pickup by plaintiff if it was awarded the contract. He had been a high school chemistry and mathematics teacher, a sales representative for Ford automobiles in Wilmette, engaged in sales insurance work and also an employee of plaintiff demonstrating and selling a patented foreign-made refuse vehicle. In an affidavit submitted by plaintiff he stated he had been a consultant in devising refuse-routing systems by computer for various municipalities in Illinois and Texas, and had participated in the collection and dumping of refuse, the repair, maintenance and operation of refuse vehicles and the design and installation of refuse compactor bodies to truck chassis. However, the record contains no details with respect to Mr. Theodorou's experience in collecting and dumping refuse such as where it occurred, for whom he was doing this work, how long he was so engaged or the precise nature of his duties. Nor is there anything in the record setting forth the precise nature of his duties as a consultant in devising refuse-routing systems by computer for various municipalities. Plaintiff in its sworn answers to interrogatories stated none of its employees had any experience in the "business of providing refuse collection and disposal services." Armon Lund, the village manager, testified in a deposition that Mr. Theodorou told him that he did not have previous experience in the business of refuse collection. Between January 5 and January 12, 1972, Mr. Theodorou met with at least 14 employees of National employed in the collection of refuse in the village who agreed to work for the plaintiff if

it was given a contract by the village, and the village trustees were informed on January 12, 1972, of plaintiff's discussions with National's employees. A substantial downtown Chicago bank committed a loan of $140,000 for equipment and working capital to plaintiff contingent upon receipt of a contract from the village.

On January 12, 1972, the bids were considered by the village trustees including the president of the Board sitting as a committee of the whole. The minutes of that meeting reflect the last items considered related to the two bids for the refuse pick-up contract and the opinions expressed. thereon were as follows:

"13. In response to an inquiry by Mayor Schwietert, it was the consensus of the Committee that the bids which have been received be rejected; Trustee West and Trustee Ostergaard added certain qualifications to their willingness to take this action.

14. In response to a question by Mayor Schwietert as to whether the Committee considered Urban Products to be a qualified bidder, Trustees Joseph and Tate indicated that they did not consider this contractor to be qualified. Trustees West, McHugh, Fisher and Ostergaard expressed a contrary view."

The village's solicitation of bids reserved the right to reject all bids received, and it specifically provided that the village might reject any bid if the "available evidence or information does not satisfy the Village that the bidder is qualified to carry out properly the terms of the Articles of Agreement." The expression of the trustees at the January 12, 1972, Committee of the Whole meeting was advisory only as a formal Village Board meeting was required to act on the bids. Such a meeting was held on January 18, 1972. By a four to three vote with President Schwietert and Trustee Ostergaard voting with the majority, the Board adopted a motion that plaintiff's bid "be rejected on the basis they are an unqualified bidder." Mr. Ostergaard explained the views he expressed at the January 12 meeting by testifying at his deposition that he wanted to keep all options open until the official vote and "saw no need for saying that anyone was unqualified until the official vote was taken at an official Board meeting." The trustees also rejected National's bid at the January 18 meeting, and the rejection of both bids was consistent with the consensus expressed in response to Mayor Schwietert's inquiry at the January 12 meeting.

Plaintiff contends that the Village Board's reason for rejection of its bid was a sham designed to eliminate the plaintiff from contention so that a lower price could be negotiated with National. In support of this contention it invites this court's attention to the following: When they rejected the plaintiff's offer, the village trustees knew that National was willing

to submit a new bid lower than plaintiff's. Subsequent to the January 18 meeting, the village officials requested that plaintiff submit another bid; plaintiff suggests the village would not have made this request had it reached a *bona fide* conclusion on January 18 that the plaintiff was not qualified. After rejecting National's bid, the village trustees at the January 18 meeting authorized the village manager to negotiate a refuse pickup contract with those contractors he deemed qualified. Since village officials continued to discuss the contract thereafter with plaintiff, the plaintiff reasons they must have regarded it as qualified. The plaintiff also points out that at a meeting on February 1, 1972, the village trustees accepted a new bid submitted by National which was less than $1000 per year lower than the plaintiff's original bid, but at that meeting the trustees considered a proposal of plaintiff submitted 10 days earlier in which it renewed its previous offer and agreed to pick up bulk items placed at the alley or curb at no extra charge. Plaintiff again asks if it was not inconsistent that the trustees should find it unqualified on January 18, but yet that the village acknowledged it considered an offer from the plaintiff at the meeting of village trustees held on February 1.

The plaintiff properly suggests that summary judgment should be denied where inferences based on the circumstances presented in support of or opposition to the motion raise genuine issues of fact. But the circumstances on which the plaintiff relies do not support such inferences, they are not inconsistent with rejection of the plaintiff's offer for lack of experience, and they do not contradict the motion to that effect adopted by the village trustees. The village's reluctance to shut the door completely on the plaintiff after January 18 does not give rise to the inference that it regarded the plaintiff as qualified. A public body serving the public interest in the best way possible will always be open to suggestions or offers which might save money or improve service. It is understandable that a village manager in a position to negotiate a contract would be willing to hear from anyone. The shortcoming of plaintiff was its lack of supervisory and managerial personnel who were experienced, and if this were corrected by the plaintiff, presumably the trustees could have reconsidered their January 18 action. Thus, we do not agree that anything which occurred after January 18 is a reasonable basis for any inference that the village regarded the plaintiff as qualified, thereby raising a genuine issue of material fact with respect to whether the reason stated for the rejection on January 18 was a subterfuge. The determining and undisputed factor is that the plaintiff acknowledged that neither it, nor its officers or employees had experience in managing refuse pickup and disposal. It is also undisputed that a majority of the trustees supported a motion rejecting the plaintiff's bid on that ground.

The qualifications and experience of the bidders were important considerations in the award of the contract because of the understandable reluctance of the village officials to entrust such a sensitive service to their constituency as garbage pickup to an organization which might prove incapable of handling it. Experimenting with a new garbage service which failed would likely bring unwanted criticism on the village's elected and appointed officials. During January 1972, Mr. Lund was preparing projections on costs and requirements for the village to provide the service itself, as it had done prior to originally contracting with National. On January 31, 1972, he advised the trustees that if National's proposal was not accepted, immediate arrangements should be made for the village to operate its own service, and on February 1, 1972, when the National proposal was accepted, the trustees discussed having the village provide the service itself as an alternative.

Thus, plaintiff on the basis of the facts advanced would not under any circumstances be able to establish by direct evidence or by inference that the reason it lost the Wilmette contract was other than its own lack of experience. It was unable to point to any facts on the basis of which the court could conclude that the plaintiff might have been injured by reason of the antitrust violations charged because absent the claimed illegal conduct of the defendants, it would have been awarded the contract.

The position of plaintiff in *Ovitron Corp. v. General Motors Corp.* (2d Cir. 1975), 512 F.2d 442, was strikingly similar to that of plaintiff here. *Ovitron* claimed that General Motors submitted a bid on a government contract which was lower than its cost in order to capture the market and stifle competition. The court affirmed the district court's dismissal of the claim because of lack of evidence showing that, in the absence of General Motor's bid, the government would have found the plaintiff a responsible enough supplier in terms of plant capacity, technical skills, experience and financial resources to make its offer acceptable. The court held in view of this conclusion that it was unnecessary to decide whether General Motors possessed monopoly power and whether it purposefully bid below its cost to eliminate competition. It is noted that in *Ovitron*, as in this case, the determination with respect to the plaintiff's qualifications were made not by a purchaser or supplier alleged to be part of a conspiracy seeking to exclude the plaintiff from the market, but rather by a third party with whom both the plaintiff and the alleged wrongdoer were attempting to deal.

This court concludes that there is no genuine issue of fact with respect to the reason for the rejection of the plaintiff's offer. Wilmette's decision not to deal with the plaintiff was solely because of the plaintiff's

lack of experience, and the conspiracy alleged had no bearing on that decision. The plaintiff could not have established that the conduct of which it complains deprived it of the contract; under these circumstances there was no triable issue of fact and the entry of summary judgment in favor of the defendants was proper. *Fooden v. Board of Governors* (1971), 48 Ill.2d 580, 272 N.E.2d 497; *People ex rel. Sharp v. City of Chicago* (1958), 13 Ill.2d 157, 148 N.E.2d 481.

The plaintiff also contends that it was deprived of the Wilmette contract when defendants reduced the price they originally bid and that this constituted a price discount in violation of section 3(4) of the Illinois Antitrust Act.[1] This provision is aimed at the situation where the seller offers a price inducement conditioned on the purchaser agreeing to an exclusive dealing contract which precludes the seller's competitors from dealing with the purchaser. It does not mean that where, as here, a municipality, independently of suggestion or pressure from prospective suppliers, decides to contract with a single supplier for a service, one seeking the business violates this provision by reducing a price it previously quoted. The bids and negotiations were premised on the village's desire for one pick-up service instead of fragmenting garbage collection between several services. The village had the authority to contract for the collection of its garbage by a single contractor. (Ill. Rev. Stat. 1973, ch. 24, § 11—19—1; *Strub v. Village of Deerfield* (1960), 19 Ill.2d 401, 167 N.E.2d 178.) There is nothing in the arrangement for exclusive garbage pickup service adopted by the village which calls for the application of section 3(4).

The defendants urge and the plaintiff disputes that this is an appropriate case in which to apply the "Noerr-Pennington doctrine" that conduct directed to inducing government officials to take lawful conduct does not violate antitrust laws even if part of a broader scheme violative of such laws. See *United Mine Workers v. Pennington* (1965), 381 U.S. 657; *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*

---

[1] Section 3(4) of the Illinois Antitrust Act (Ill. Rev. Stat. 1971, ch. 38, § 60-3(4)) provided: "Every person shall be deemed to have committed a violation of this Act who shall:
    (4) Lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services, whether patented or unpatented, for use, consumption, enjoyment, or resale, or fix a price charged thereof, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

(1961), 365 U.S. 127; *Metro Cable Co. v. CATV of Rockford, Inc.* (7th Cir. 1975), 516 F.2d 220; *Sun Valley Disposal Co. v. Silver State Disposal Co.* (9th Cir. 1969), 420 F.2d 341. In view of our holding that any illegal conduct in which the defendants might have engaged was not the reason plaintiff failed to obtain the Wilmette contract, it is unnecessary to consider whether the "Noerr-Pennington doctrine" applies to the facts of this case.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.