SHERMAN COLLEGE OF STRAIGHT CHIROPRACTIC, Straight Chiropractic Academic Standards Association, Inc., William Sukovitch and Michael Kudlas

v.

AMERICAN CHIROPRACTIC ASSOCIATION, INC., the Council On Chiropractic Education, Inc., National Board of Chiropractic Examiners, and Sid E. Williams.

Civ. No. C81–1767.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 9, 1986.

John C. Butters, Sherry Armstrong, Atlanta, Ga., for plaintiffs.

Hugh W. Gibert, Arnall, Golden & Gregory, Atlanta, Ga., Lewis M. Popper, C. Coleman Bird, John F. Daly, Washington, D.C., H. Thomas Coghill, Paul E. Goodspeed, Coghill and Goodspeed, Denver, Colo., Donald F. Walton, Frank B. Strickland Skiller, Wilson & Strickland, Atlanta, Ga., Sigmund Timberg, Washington, D.C., for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This antitrust action is brought under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to redress injuries allegedly sustained by Plaintiffs Sherman College of Straight Chiropractic ("Sherman College") and Straight Chiropractic Academic Standards Association, Inc. ("SCASA") as a result of Defendants' violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[1] The case is before the court for findings of fact and conclusions of law, having been tried without a jury in March of 1985.

*Findings of Fact*

The evidence presented at trial—especially the documentary evidence—was voluminous. Nonetheless, most of the facts are undisputed and in any event are not as complex as the length of the record might indicate. The court's findings of fact are as follows:

Plaintiffs and Defendants respectively are adherents of two different schools of

---

1. No evidence was adduced at trial regarding the claims of Plaintiffs Sukovitch and Kudlas, who apparently are graduates of Sherman College and practicing chiropractors. The motion to dismiss of Defendant American Chiropractic Association was granted at the close of Plaintiff's evidence. Judgment was entered in favor of Dr. Williams in a separate order entered April 16, 1985.

thought within the chiropractic profession. Defendants assert that chiropractors should be primary health care providers who diagnose disease, in addition to performing spinal analysis and manipulation. Therefore, Defendants believe that chiropractic education should include training in general diagnostic procedures. They contend the public is better served when chiropractors can identify possible medical problems and if necessary refer the patient to another health care provider. Plaintiffs, on the other hand, assert that chiropractors should limit themselves to procedures associated with identifying and correcting misalignments of the spinal vertebrae. They contend that chiropractors lack the broad medical education necessary to effectively diagnose medical ailments, and that the administration of diagnostic tests by chiropractors for possible referral purposes is dangerous and imposes needless charges

on patients. Both Plaintiffs and Defendants agree that correcting vertebral misalignments contributes in a significant way to the human body's ability to maintain health.

Over the past ten to fifteen years, the pro-diagnostic forces have achieved dominance in the profession. This has occurred to a great extent through the sponsorship of Defendant American Chiropractic Association, Inc. ("ACA"), the primary professional organization for chiropractors in the United States. In 1971 ACA formed Defendant Council on Chiropractic Education, Inc. ("CCE") as a specialized accrediting agency for chiropractic colleges. Since then, ACA has backed CCE financially.[2] CCE will only accredit chiropractic colleges which subscribe to the pro-diagnostic philosophy. Mainly for this reason, CCE declined to grant accreditation to Sherman College in 1974.[3]

2. In 1974, CCE secured recognition as a nationally recognized accrediting agency by the United States Office of Education ("USOE"), the predecessor to the present Department of Education. CCE was determined to be a "reliable authority as to the quality of training offered" by educational institutions. *See* 20 U.S.C. § 1141(a). The principal purpose of federal recognition is to establish a mechanism for screening schools for participation in federal aid programs. *See* 34 C.F.R. § 603.1. CCE's recognition was renewed in 1975, 1979 and 1982, and will be up for renewal again in 1986.

In 1979, Sherman College challenged the USOE's renewal of CCE's recognition on the grounds that CCE failed to represent the profession as a whole. The renewal was subsequently upheld by the United States District Court for the District of Columbia. *See Sherman College of Straight Chiropractic v. United States Commissioner of Education,* 493 F.Supp. 976 (D.D.C. 1980). CCE was also approved as an accrediting agency by the Council on Post Secondary Accreditation ("COPA") in 1976. COPA is a private, nonprofit association of accrediting agencies and national higher education associations, which endeavors to promote quality in the accreditation process by reviewing and approving accrediting agencies. COPA renewed CCE's approval in 1982.

3. Despite its rejection by CCE, Sherman is clearly a substantial educational institution, dedicated to giving its students a quality chiropractic education within the parameters of its chiropractic philosophy. The court also found Sherman's founder and president, Dr. Thomas A.

Gelardi, to be a person of high intelligence and integrity.

Sherman College has been fully accredited by the Southern Association of Colleges and Schools, a regional accrediting agency, since December of 1984. Sherman also has candidate status with Plaintiff SCASA, the Straight Chiropractic Academic Standards Association, Inc. Although accreditation with these organizations increases the prestige of Sherman's program, such endorsements generally do not help Sherman's graduates to become licensed chiropractors because of the regulatory choices made by the state licensing boards. (*See* discussion in text at p. 719, *infra*).

SCASA is an accrediting agency formed in 1978, with Sherman College and Pennsylvania College of Straight Chiropractic (formerly Adio Institute) as founding members. SCASA has not made application to the USOE or to COPA for recognition.

SCASA has sought recognition as an accrediting agency for chiropractic colleges from a number of states. It has received recognition as of today only from the District of Columbia. CCE testified against SCASA at several state hearings on approval of SCASA, including New Hampshire, South Carolina and the District of Columbia.

Both USOE and COPA will entertain applications from more than one accrediting agency in a particular professional field. COPA currently recognizes two accrediting agencies in legal education, as well as two accrediting agencies in the field of medical assistance and medical technology. The evidence indicated that dual recogni-

CCE's Educational Standards and Policies assign central importance to training future doctors of chiropractic in the skills of performing a diagnosis. The foreword to the standards states:

> The purpose of professional education is to prepare the doctor of chiropractic as a primary health care provider. As a portal of entry to the health delivery system the chiropractic physician must be well educated to diagnose, including, but not limited to, spinal analysis, to care for the human body in health and disease, to consult with, or refer to, other health care providers. It is this concept of the chiropractic physician which serves as a basis for interpretation of the Educational Standards for Chiropractic Colleges.

CCE's standards and policies require chiropractic students to be taught, both by didactic and clinical means, to perform a full body screening examination, using a patient history, physical examination, and appropriate diagnostic aids, which may include x-rays and laboratory tests. *See* Defendants' Exhibit 29, "Educational Standards for Chiropractic Colleges," Sec. III, pp. 17 and 23, and Sec. IV, pp. 17–19. While this diagnostic examination apparently differs in certain respects from an examination by a medical doctor, it must be sufficient at least to identify the existence of an abnormality in any part of the body. *See* Defendants' Proposed Findings of Fact, p. 24. According to CCE standards, the purpose of the examination is not solely to prepare the way for chiropractic treatment, but also to identify any need for consultation with or referral to medical doctors and other practitioners within the general health care system. *Id.*

Through lobbying efforts, ACA and CCE have persuaded most states to permit only graduates of pro-diagnostic schools to become licensed chiropractors. In some states this has required legislative action, but in most states chiropractic licensing boards have done this by regulation. One form of such regulation states that only graduates of institutions accredited by CCE may apply for licensure. Other regulations are worded differently, but in application most operate to exclude graduates of anti-diagnostic colleges. For example, some states allow licensure only to graduates of schools "accredited by an agency recognized by the U.S. Department of Education." CCE is the only accrediting agency for chiropractic schools which has ever applied for or obtained recognition from the U.S. Department of Education.

At relevant times, ACA and CCE have had a close relationship with the Federation of Chiropractic Licensing Boards ("FCLB"), an organization to which all members of state licensing boards belong.[4] Representatives of these three organizations have held joint meetings to discuss various matters of mutual interest, including problems created by the non-conforming anti-diagnostic colleges. For example, at the request of CCE in 1974, FCLB passed a resolution urging members of the state licensing boards to require graduation from a CCE-accredited institution as a condition of licensure. Additionally, a number of individuals served in leadership positions in more than one of these organizations, sometimes simultaneously.[5]

The court infers that most state chiropractic licensing boards were predisposed

---

tion for both CCE and SCASA would be unlikely but it is possible.

**4.** Plaintiffs contend FCLB conspired with Defendants but FCLB is not a Defendant in this action.

**5.** For example, Dr. Vern R. Webster was vice president of the FCLB from 1972 through 1977, and president from 1977 through 1979. He was also a director of the NBCE from 1975 through 1979, and has occupied that position since 1981 as well. Furthermore, Dr. Webster was a member of the Commission on Accreditation of the

CCE from approximately December of 1978 through February of 1981.

Dr. James A. Mertz served as vice president of the FCLB from 1974 to 1975, and as president from 1975 through 1976. Dr. Mertz was vice president of the CCE in 1976, and president in 1977 and 1978. He also served as a member of the Commission on Accreditation of the CCE from July of 1974 through December of 1982, serving as chairman of the Commission the last two years. While president of the FCLB, Dr. Mertz also served as a director on the NBCE.

to grant requests by CCE and FCLB to permit only graduates of pro-diagnostic institutions to become licensed chiropractors. This is clear from the fact that in 1974 FCLB—whose general membership consists of the state licensing boards and board members—passed the recommendation urging the state boards to allow licensure only to graduates of pro-diagnostic institutions. This was at the time when ACA and CCE began their campaign to lobby the state boards. Also, the fact that ACA has undertaken such aggressive, continuing efforts to promote pro-diagnostic philosophy reflects the existence of a broadbased commitment by the profession to that philosophy. Therefore, it is clear that in addressing the chiropractic members of the licensing boards on this subject, ACA and CCE were—if not actually "preaching to the converted"—addressing a very receptive audience. However, there is no evidence that any agreements were reached or any commitments made prior to the public hearings which were held by the various boards on limitation of licensure. Insofar as the record reflects, formalities and proper procedures were observed.

Both CCE and FCLB sought the enactment of various CCE requirements by Defendant National Board of Chiropractic Examiners ("NBCE"), an organization which develops and administers national chiropractic examinations. All states use the NBCE examination in some way in determining whether to license applicants to practice chiropractic. The directors of NBCE are selected through a combination vote/appointment process controlled by FCLB. Through threats of antitrust litigation, Sherman successfully averted the efforts of ACA, CCE and FCLB in 1978 to get NBCE to permit only graduates of CCE accredited schools to take the national chiropractic exam.[6] However, CCE was successful in getting NBCE to allow only faculty members of CCE approved schools to submit proposed examination questions.

In the wake of ACA's, CCE's and FCLB's successful campaign to make diagnosis a fundamental aspect of chiropractic training,[7] the fortunes of anti-diagnostic chiropractic colleges have declined. The enrollment of Plaintiff Sherman College[8] has not grown at a time when enrollment at pro-diagnostic institutions is increasing. Sherman's graduates can become licensed chiropractors in only 11 states.

Plaintiffs' basic contention at trial was that Defendants ACA, CCE and NBCE conspired with the FCLB and various state licensing boards to restrict Plaintiffs' ability to compete within the chiropractic profession. The restriction allegedly occurred through control of access to chiropractic accreditation, examination, and licensing. Plaintiff Sherman College seeks to collect damages equal to three times the net revenues it contends it has lost as the result of Defendants' alleged antitrust violations. Plaintiff SCASA presented no proof of damages. Both Sherman College and SCASA seek injunctive relief against future violations of the antitrust laws.

Defendants denied that there was any conspiracy or improper restriction. Secondly, they argued that any actions taken by them which adversely affected Plaintiffs were legitimate measures which will better educate the chiropractic profession and promote better health care for chiropractic patients. Defendants also contended that any actual harm to Plaintiffs occurred as a result of the independent actions of state legislative or administrative bodies and as a result of protected lobbying

---

6. NBCE points out that this request was initiated by the members of certain state chiropractic licensing boards. They threatened to stop using the NBCE exam for licensure purposes unless graduates of anti-diagnostic schools were denied permission to take the exam. This fact is evidence which shows that at least some chiropractic licensing boards were actively involved in assisting the pro-diagnostic group.

7. The parties did not address the issue of whether the administration of general diagnostic tests by chiropractors would or does violate scope-of-practice limitations in the various states.

8. Sherman College is presently one of two anti-diagnostic chiropractic colleges in the United States.

activity, and therefore cannot serve as the basis for an antitrust suit against Defendants. Defendants dispute Sherman College's claimed damages, contending that they are unduly speculative.

*Conclusions of Law*

The court makes the following conclusions of law:

The antitrust laws are concerned with protecting competition, not competitors. *Alameda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). It is therefore critical to identify the consumer interests which are at stake. This requires identification of the product and those who consume it. In the instant case, a lack of clarity exists because Plaintiffs have not identified what product has been the object of Defendants' alleged anti-competitive activities.

Nonetheless, the court will analyze Plaintiffs' claims from the standpoint of two possible products: chiropractic education and chiropractic health care services. Most of Plaintiffs' evidence appears to have been addressed to restriction or regulation of chiropractic education. It is this restriction, the court concludes, that has had the most direct impact on Sherman's continued growth as a chiropractic college.

Looking at the case in this way, the consumers of chiropractic education are those students who aspire to attend or who do attend chiropractic colleges. The evidence showed that within the United States there are presently about seventeen chiropractic colleges, two of which (including Sherman College) adhere to the anti-diagnostic philosophy; the others are all pro-diagnostic. The court will assume that these chiropractic colleges compete with each other to attract and hold tuition-paying students.

■ Because Plaintiffs have presented no evidence of diminished competition in the chiropractic education market, it is critical to determine whether Plaintiffs' claim should be evaluated under the rule of reason or rather, under the "per se" rule. If the per se rule applies, then Plaintiffs need not demonstrate, by quantifiable evidence, that competition in a relevant market has been diminished. *NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 2960–62, 82 L.Ed.2d 70 (1984). On the other hand, if a rule of reason analysis is appropriate, then Plaintiffs' failure to prove actual anti-competitive effect in a relevant market is fatal to their case. *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 1567–8, 80 L.Ed.2d 2 (1984).

■ The per se rule is appropriately applied where the nature of Defendants' activities is inherently anti-competitive and without redeeming societal value. *Broadcast Music v. CBS*, 441 U.S. 1, 8–10, 99 S.Ct. 1551, 1556–57, 60 L.Ed.2d 1 (1979), *but cf Arizona v. Maricopa Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 46 (1982) (emphasizing need to limit inquiry to nature of arrangement between defendants). A case involving a concerted refusal to deal does not automatically invoke application of the per se rule. *Northwest Wholesale Stationers, Petitioner, v. Pacific Stationary and Printing Company*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

■ The court concludes after consideration that Plaintiffs have failed to make the threshold showing necessary to invoke application of the per se rule. The evidence showed that the number of schools of chiropractic has increased from nine schools in 1971 to seventeen schools today. Those schools of chiropractic which offer a pro-diagnostic course of study offer courses in diagnostic procedure in addition to the basic chiropractic education courses. Regulation of curriculum is an activity which is inherently appropriate for an accrediting body. The court will not assume that extra courses in diagnosis are valueless to a student of chiropractic. The court concludes, therefore, that any restraint imposed by Defendants' alleged anti-competitive activities may not be evaluated under the per se rule. Accordingly, Plaintiffs' failure to prove actual diminution of competition is

fatal to their claim, assuming that the relevant product is chiropractic education.

This action might also be viewed from the standpoint of the patient public as consumers of chiropractic services. In an indirect sense, Sherman College is a supplier of these services in that it produces practitioners who ultimately supply the service. Plaintiffs' argument is necessarily that graduates of anti-diagnostic colleges provide chiropractic services different in kind (and cost) than those provided by graduates of the pro-diagnostic colleges. Thus, Plaintiffs' argument is that the interests of the consumer public are impaired when it is denied access to "straight" or anti-diagnostic chiropractors. The specter raised by Plaintiffs is that the public will be bilked by having to pay for diagnostic procedures which cannot be properly evaluated except by medical doctors. They point out that where diagnosis results in a reference to a medical doctor, that any diagnostic procedure will surely be repeated, resulting in a double charge to the patient. In cases where no referral is made because the chiropractor concludes that there is no problem, Plaintiffs argue there is danger in the patient's relying on such diagnosis. With no alternative access to chiropractors who do not perform diagnostic tests, Plaintiffs argue, consumers will be forced to accept diagnostic services from chiropractors which they might not otherwise choose to accept. Hence, Plaintiffs argue that the anti-competitive design of Defendants' activities is so clear that no actual proof of diminished competition is necessary.

■ Nonetheless, after consideration the court declines to apply the per se rule in this case. Antitrust cases involving the impact of professional educational standards on the consumer public are more appropriately analyzed under the rule of reason. *See Wilk v. AMA*, 719 F.2d 207, 221–2 (7th Cir.1983). Professions are different in certain respects from commercial businesses. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia*

*State Bar*, 421 U.S. 773, 788–89, n. 17, 95 S.Ct. 2004, 2013, n. 17, 44 L.Ed.2d 272 (1975); *Wilk*, 719 F.2d at 221–2. Restrictions on access by imposition of educational and training requirements and a degree of self-regulation are definitional aspects of the term "profession." *See AMA v. United States*, 130 F.2d 233, 246–48 (D.C.Cir.1942). While a profession certainly could undertake a regulatory measure which would disserve the public interest, the general presumption is that the public interest is served by the promotion of enhanced education and training requirements. Secondly, there is danger in a court's presuming without evidence that the effects of higher educational standards will be adverse to the consumer public. The matter of what training is relevant and appropriate in a given profession is not likely susceptible to intelligent use of facial presumptions. In this case, therefore, the court will not presume that education in diagnostic procedures lacks any possible relevance to quality chiropractic care.

■ Plaintiffs have further argued that even if a rule of reason applies, they are entitled to prevail. However, the court finds that the evidence does not preponderate in favor of a finding of unreasonable anti-competitive effect. There is no evidence in the record as to what impact the increased educational requirements for chiropractors has had or likely will have on the nature and cost of chiropractic services. The record does not reflect what type of diagnostic procedures are actually being performed by chiropractors. It is unclear whether chiropractors as a group have enough power in the patient market to deprive patients of the right to choose not to receive diagnostic services. Finally, the court is unwilling to hold in the absence of evidence that the public interest is prejudiced by the use of any diagnostic procedures by chiropractors.

■ Plaintiffs' claims also fail for another reason. As previously noted, those states which have excluded graduates of anti-diagnostic institutions from becoming licensed chiropractors have done so either

by legislative or administrative act. Defendants' activities in persuading these official state bodies to so act are immunized from liability under the *Noerr-Pennington* doctrine and under the related immunity established for state action in the *Parker v. Brown* doctrine. Though certain exceptions to these immunity doctrines have been recognized by the court, no exception applies under the facts of the instant case.

The *Noerr-Pennington* doctrine establishes an immunity from antitrust liability for genuine political lobbying of governmental officials. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a group of railroads conducted a misleading political campaign in Pennsylvania to gain passage of laws that would limit trucks' use of roads for long hauling freight. The Supreme Court held that such conduct was beyond the scope of the Sherman Act:

> The Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.

365 U.S. at 136, 81 S.Ct. at 528. The Court was particularly concerned with potential infringement of the First Amendment right to petition:

> A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would ... deprive the government of a valuable source of information and, at the same time, deprive people of their right to petition in the very instances in which that right may be of the most importance to them.

*Id.* at 139, 81 S.Ct. at 530. The Sherman Act thus regulates only "business activity," not "political activity." *Id.* at 137, 81 S.Ct. at 529.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court reaffirmed the *Noerr* principle. In *Pennington*, the large coal companies and the United Mine Workers had successfully persuaded the Secretary of Labor to set a high minimum wage for TVA projects in order to drive smaller coal companies out of the market. The Court held this conduct to be outside the reach of the Sherman Act:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

381 U.S. at 670, 85 S.Ct. at 1593.

It is clear in this case that Defendants engaged in political lobbying when they persuaded state legislators and administrative boards to bar graduates of anti-diagnostic colleges from licensure. In *Noerr*, however, the Court noted that there may be instances where the political activity "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 533. The "sham exception" was clarified in *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The *California Motor Transport* defendants allegedly conspired to oppose all applications for operating rights filed by their competitors. The Court held that the *Noerr-Pennington* doctrine did not apply in that instance, because

> ... The allegations are not that the conspirators sought "to influence public officials," but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process.

404 U.S. at 512, 92 S.Ct. at 612.

The Court therefore concluded that otherwise valid petitioning activity may be subject to antitrust scrutiny where a "pattern of baseless, repetitive claims" emerges which "leads the fact finder to conclude that the administrative and judicial pro-

cesses have been abused." 404 U.S. at 513, 92 S.Ct. at 613.

In this case, the record fails to disclose a pattern of baseless claims by Defendants before the licensing boards which could support a conclusion that the administrative process was abused. In fact, it is from Defendants' success before the state boards that Plaintiffs claim injury to themselves. Thus, Plaintiffs must rely on their claim that the licensing boards themselves were members of the conspiracy through the FCLB, thereby rendering Plaintiffs' access to those agencies meaningless and Defendants' activities unprotected.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court specifically reserved the question of the applicability of the Sherman Act to the case of "the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." *Id.* at 351, 63 S.Ct. at 313. In *United Mine Workers v. Pennington,* the Court noted that no antitrust damages could be recovered for "the act of a public official who is not claimed to be a co-conspirator." 381 U.S. at 671, 85 S.Ct. at 1594.

The Court again noted the existence of a public co-conspirator exception in *California Motor Transport v. Trucking Unlimited, supra,* stating: "Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression." 404 U.S. at 513, 92 S.Ct. at 613. In support of this proposition, the Court cited *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) and *Harman v. Valley National Bank of Arizona,* 339 F.2d 564 (9th Cir.1964).

In *Continental Ore,* the Court found no antitrust immunity for private companies' dealings with a purchasing agent of the Canadian government, where the government agent was alleged to be a co-conspirator in the scheme. 370 U.S. at 706–707, 82

S.Ct. at 1414. In *Harman,* the Ninth Circuit held that *Noerr* did not necessarily bar antitrust liability for the defendants' joint efforts to influence the Attorney General of Arizona, in pursuit of a monopoly on commercial banking, where the Attorney General had allegedly acted as a participating conspirator in the scheme. 339 F.2d at 566.[9]

More recently, the Fifth Circuit upheld the trial court's application of the public co-conspirator exception in *Affiliated Capital Corporation v. City of Houston,* 735 F.2d 1555 (5th Cir.1984) (en banc), affirming 519 F.Supp. 991 (S.D.Tex.1981), *petition for cert. filed sub nom. Gulf Coast Cable Television Company v. Affiliated Capital Corporation,* 53 U.S.L.W. 3509 (U.S. Dec. 14, 1984). An unsuccessful applicant for a cable television franchise in Houston had brought suit alleging that the successful applicants and certain officials of the city had conspired in the award of the cable franchises. The jury found that such a conspiracy existed. The trial court then held that the *Noerr-Pennington* doctrine was inapplicable under the public co-conspirator exception. 519 F.Supp. at 1016–23. The Court of Appeals affirmed, stating that "numerous examples of official involvement in the conspiracy abound," and that "the actions of the mayor and city council indicate a 'vigorous involvement in orchestrating certain aspects of the conspiracy.'" 735 F.2d at 1567.

The public co-conspirator exception to the *Noerr-Pennington* doctrine has been criticized by certain courts and commentators. In *Metro Cable Company v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir.1975), the Seventh Circuit refused to recognize such an exception on the grounds that "such a rule would in practice abrogate the *Noerr* doctrine." 516 F.2d at 230. The court in *Metro Cable* did not appear to consider whether a secret conspiracy might completely subvert the policy making process, but instead expressed the fear that

---

9. The Ninth Circuit later declined to follow *Harman* in *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341, 342 (9th Cir.1969).

*See also Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 229–30 (7th Cir.1975).

any member of a governmental body who simply agreed to support defendants' position would thereby become a "co-conspirator." 516 F.2d at 230.

The Eighth Circuit has also refused to rely on the public co-conspirator exception, noting that it has been subject to criticism. *See First American Title Company v. South Dakota Land Title Association,* 714 F.2d 1439, 1446 (8th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733, 746 (8th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983). Professor Fischel has argued in a widely noted article that "in most cases the co-conspirator exception is unworkable and should not be recognized." Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.R. 80, 115 (1977).

The Third Circuit, however, has recognized the public co-conspirator exception. In *Duke & Company, Inc. v. Foerster,* 521 F.2d 1277 (3rd Cir.1975), the Court of Appeals reversed the district court's dismissal of the complaint, holding in part that the *Noerr-Pennington* doctrine did not shield defendants from antitrust liability:

Both *Noerr* and *Pennington* involved suits against *private parties* who had allegedly conspired to influence governmental action. In neither case was it alleged that the governmental entity had collaborated to promote the conspiracy. Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the Noerr-Pennington doctrine is inapplicable.

*Id.* at 1282 (emphasis in original).

Despite this broad language in the *Duke* opinion, some courts have distinguished *Duke* on the grounds that it involved alleged misconduct on the part of governmental agencies acting in a proprietary or procurement mode, rather than as a policy making body. *First American Title Company,* 714 F.2d at 1446. In this case, the state chiropractic licensing boards were clearly acting as regulatory or policy making bodies, and not as quasi-commercial entities.

There is no precedent in the Eleventh Circuit which expressly considers the public co-conspirator exception. The case outside this circuit which applies the exception to facts most closely resembling this case is *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 663 F.2d 253 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

In *Federal Prescription,* a mail order pharmacy brought an antitrust action against the American Pharmaceutical Association ("American"), a national association of pharmacists, alleging that American had conspired with other trade organizations to restrain the plaintiff's mail order prescription service. Among the alleged co-conspirators were the Iowa Board of Pharmacy Examiners, the National Association of Boards of Pharmacy, and various state pharmaceutical associations associated with American.

The district court found that these organizations had participated in a conspiracy with American to restrain the budding mail order pharmacy industry. The trial court focused on the relationships among the conspirators and on their concerted efforts to suppress the mail order pharmacists.

For example, the National Association of Boards of Pharmacy was found to have participated in the conspiracy by adopting American's resolutions opposing mail order drug distribution and drug advertising and by sending copies of these to all of its members. The National Association is made up of the members of the state pharmaceutical licensing boards, and plays much the same role in the pharmaceutical profession as the FCLB does in the chiropractic profession. The court also found that the National Association had cooperated in setting up a conference "to determine what steps should be taken to oppose mail order drug distribution." 484 F.Supp. at

1203. At that meeting, "all state boards were asked to use every legal method to oppose the establishment of mail order houses." *Id.*

The court also found the Iowa Board of Pharmacy Examiners to have been a co-conspirator. The Iowa Board is a governmental body empowered to license and regulate the practice of pharmacy in the state of Iowa. The members of the board are selected by the governor from a list compiled by the Iowa Pharmaceutical Association, an organization affiliated with American and subject to its Code of Ethics.

The trial court found that the Iowa Board had undertaken a number of unlawful actions against Federal. These findings were summarized in the opinion of the D.C. Circuit:

> The Board first denied Federal's license application, granting it only after being told by the Iowa Attorney General that state law did not prevent issuance of a pharmacy license to a mail order house. Then, in 1964, the Board delayed the grant of Federal's change of address license. The Board also imposed burdensome inspection conditions on Federal, and cooperated with pharmaceutical associations in Iowa and Nebraska in preparing forged prescriptions to be sent to Federal. In 1965, on the basis of these filled prescriptions, the Board revoked Federal's pharmacy license, but Federal succeeded in Iowa state court in having the revocation annuled. In 1968 the Board attempted to seize Federal's inventory pursuant to a search warrant, but withdrew the warrant after Federal filed suit to prevent the search and before any seizure was affected. In 1970 the Board withheld Federal's annual relicensing. In 1973 the Board induced the state to seek to have Federal enjoined from filling out of state prescriptions, but the action was dismissed and the Iowa Supreme Court affirmed the dismissal. Finally, in 1966, the Board denied Federal's request to be certified as a suitable employer of pharmacist interns. The reason for the denial, the court found, was that Federal did not belong to the Iowa Pharmaceutical Association.

663 F.2d at 259 (footnotes omitted).

Although the trial court found that the co-conspirators had engaged in a group boycott, the court also found some of their actions to be beyond the coverage of the Sherman Act under the *Noerr-Pennington* doctrine. However, the court concluded from the Iowa Board's actions against Federal that the Board's administrative processes had been abused through a conspiracy among American, the Iowa and Nebraska state pharmaceutical associations, and the Board members themselves. American was therefore held liable for the Board's actions under the co-conspirator exception.

On appeal, the Court of Appeals reviewed the evidence and reversed the trial court's finding of conspiracy between American and the state boards. The Court of Appeals therefore concluded that the co-conspirator exception to *Noerr* was inapplicable, while expressing doubt about the doctrine's validity:

> It seems doubtful that the existence of a public co-conspirator would explain any result more satisfactorily than one of the more established exceptions to the Noerr doctrine ...

663 F.2d at 264, n. 11.

The appeals court also found that the evidence of the Iowa Board's "unusually aggressive stance against mail order pharmacy," 663 F.2d at 267, was insufficient to support an inference of conspiracy with American. The court went on to uphold the trial court's other applications of the *Noerr-Pennington* doctrine.

In this case, the actions of CCE in relation to the state licensing boards are difficult to classify. The burden lies with Plaintiffs to establish that an exception to the *Noerr-Pennington* doctrine applies. *MCI Communications v. American Telephone & Telegraph,* 708 F.2d 1081, 1155 (7th Cir.1983). This court need not actually determine whether the co-conspirator exception should be recognized, because the

court finds that the evidence is insufficient to support its application. ·

Plaintiffs' argument for a conspiracy between the various state chiropractic licensing boards and Defendants is based on their relationship through the Federation of Chiropractic Licensing Boards. Under the FCLB bylaws, all members of chiropractic licensing boards in the states and territories of the U.S. are eligible to become active members of the Federation. Each board becomes a "member board" by paying dues, and the board as a whole has one vote at every meeting of FCLB. The bylaws states that the members of each board shall have no vote separate and apart from their board. Any member board may also send a qualified representative to FCLB annual meetings to participate in the deliberations.

The FCLB is managed by a five person executive board, one member of which is selected from each of five geographic districts. The representatives of the member boards vote for director by district at the annual meeting of the FCLB. The president and vice president of the Federation are elected annually by secret ballot; the secretary and treasurer are then appointed.

Resolutions for the Federation's consideration are routinely presented at the February annual meetings and voted upon by the representatives of the member state licensing boards. However, the evidence shows that the 1974 resolution urging the state boards to pass CCE requirements was adopted at a September 29 meeting of the Executive Board and officers of the FCLB, not at an annual meeting. *See* Plaintiff Exhibit No. 30.

There is nothing in the FCLB bylaws to indicate that either type of resolution is in any sense "binding" on the member boards. Although certain CCE supporters characterized the resolutions as "pledges" or "commitments" on the part of the boards or board members, this appears to have been merely a rhetorical device, and not a reference to an actual obligation. Instead, the testimony as a whole indicates that such resolutions operate as recommen-dations from the Federation to its member boards with respect to those particular matters of chiropractic policy.

Plaintiffs' theory as to how the state licensing boards became co-conspirators through the FCLB is not completely clear. Plaintiffs' proposed findings of fact suggest at one point that it is only the members of state boards who support the 1974 FCLB resolution who have joined the conspiracy. Plaintiffs' Proposed Findings of Fact 278. However, as noted above, the state boards themselves did not vote on that resolution. Furthermore, the evidence fails to identify which states voted in favor of any other resolutions which Plaintiffs find restrictive. Elsewhere in the pleadings and at trial, Plaintiffs took the position that the licensing boards' mere membership in the FCLB sufficiently implicates them in the alleged effort to restrain the anti-diagnostic faction.

The D.C. Circuit considered virtually an identical situation in *Federal Prescription, supra.* State pharmaceutical board members automatically became members of the National Association of Boards of Pharmacy, and delegates from those state boards determined the policies of the National Association. Those policies included asking "all state boards ... to use every legal method to oppose the establishment of mail order houses." 663 F.2d at 258. Furthermore, many state boards are made up of members of the state pharmaceutical associations, who have a dominant voice in determining the policy of the American Pharmaceutical Association. Finally, American apparently boasted that sixteen state boards had responded to its request that cease and desist orders be issued against mail order pharmacies. *Id.* at 265.

The Court of Appeals held as a matter of law that this evidence failed to show that the state board members had participated in a conspiracy with American. The court stated:

First, as to American's communications to the state boards, we decline to assign probative value to the fact that some state boards responded favorably ... It

would make a nullity of *Noerr* to hold the state board to be a co-conspirator, and the petitioning activity directed at it thus unprotected, on the basis that the petitioning was successful. That a public official is persuaded by the entreaty of a lobbyist does not make him the lobbyist's co-conspirator.

663 F.2d at 265.

For similar reasons, the *Federal Prescription* court refused to treat the evidence of overlapping membership as probative of conspiracy. The court stated:

> Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations, much less in a conspiracy between those associations in yet another association.

*Id.* at 265. (citation omitted). The court also refused to impose liability against American on the basis of a "membership ratification" theory, and rejected the district court's findings that the Iowa Board's aggressive stance against mail order pharmacy was evidence of an unlawful conspiracy with American. The court stated:

> The behavior of the Iowa Board in this case is not of the kind that could only make sense in the context of the behavior of others; rather, it can be persuasively explained by the exercise of rational, independent judgment.

663 F.2d at 267.

The D.C. Circuit thus emphasized that proof of a conspiracy with a state agency requires that the evidence show more than just successful lobbying by the defendants and common membership in professional associations. The opinion in *Federal Prescription* indicates that the evidence must show true complicity on the part of the governmental body or bodies for the co-conspirator exception to apply. This conclusion is consistent with the general rule in this circuit that exceptions to the *Noerr-Pennington* doctrine must be construed narrowly. *Mid-Texas Communication v. A.T. & T.*, 615 F.2d 1372, 1384 (5th Cir.1980).

The connection between the actions of the FCLB and the state licensing boards is too tenuous to give rise to an inference of unlawful agreement. Although the state boards are obviously not wholly independent of the FCLB, the evidence fails to reveal any evidence of interaction between the state licensing boards or their members, on the one hand, and the FCLB and other alleged conspirators, on the other hand, which went beyond petitioning through appropriate channels. As the *Federal Prescription* court stated:

> A different case would result were it shown that state board members were bribed by American, or met in an unlawful fashion with its officers, or otherwise induced by American, *by means other than legitimate lobbying and publicity,* to take action against mail order houses. Evidence of this sort does not appear on the record.

663 F.2d at 266 (emphasis in original).

The co-conspirator exception is therefore inapplicable in this case. Defendants' appearances and other communications to the state chiropractic licensing boards thus qualify as protected petitioning activity, and may not serve as the basis for antitrust liability.

The court therefore finds that Plaintiffs have failed to establish a violation by Defendants of § 1 of the Sherman Act. For the reasons set forth above, the court also finds that Plaintiffs have failed to establish that Defendants monopolized or conspired to monopolize any relevant chiropractic market in violation of § 2 of the Act. The court therefore DIRECTS that judgment be entered in favor of Defendants The Council on Chiropractic Education, Inc. and the National Board of Chiropractic Examiners.