## ALLERTON v. CITY OF CHICAGO and another.

(Circuit Court, N. D. Illinois. December 10, 1880.)

1. MUNICIPAL CORPORATION—STREET RAILWAY—POWER TO LICENSE.

   A general law of the state of Illinois, (1872,) for the incorporation of cities and villages in the state, provided that the city council in cities should have authority to license hackmen, draymen, omnibus drivers, cabmen, expressmen, and all others pursuing like occupations, and to prescribe their compensation. *Held*, that street railways were within the purview of such statute.

2. SAME—POLICE POWER.

   An ordinance of the council of the city of Chicago (March 18, 1878) required each street railway company within the city to obtain an annual license, and to pay for the same the sum of $50 for each car operated and run upon its line. *Held*, that such ordinance was a valid exercise of the police power of the city council.—[ED.

In Equity.

*Hitchcock, Dupee & Judah, E. A. Small, C. Beckwith,* and *Goudy, Chandler & Skinner,* for plaintiff.

*R. S. Tuthill* and *A. S. Bradley,* for City of Chicago.

DRUMMOND, C. J. On March 18, 1878, the council of the city of Chicago passed an ordinance requiring the companies which operated street cars for the conveyance of passengers upon any lines of horse or city railway within the city of Chicago to obtain a license in the month of April of each year, and pay for the same the sum of $50 for each car operated or run. A penalty was imposed for failing or refusing to take out a license. The company obtaining the license was required to place conspicuously in every car so operated and run in the city a certificate signed by the city clerk, and giving the number of the car, and stating that a license had been obtained, and that the necessary fee had been paid; and a penalty was also imposed for a failure to post or keep such certificate in the car.

The only question in the case, which arises on a demurrer to the bill of complaint filed by a stockholder of the city railway company to enjoin the payment of the license fee, is whether this ordinance was valid. Several corporations operating street cars in the city of Chicago have been au-

thorized to construct their railways, and operate them, by
various ordinances which have been from time to time passed;
and these ordinances have been recognized and affirmed,
many of them, by the legislature of the state.    By virtue of
these ordinances and acts of the legislature the companies
have the right to run their cars for the transit of passengers
through the city.    It cannot be said, therefore, that the effect
of the ordinance which has been specially referred to, although
it is called a license, would be to give the companies the
privilege of running their cars.    That they have by virtue of
the ordinance and the acts of the legislature.    There can be no
doubt that the legislature would have the right, under the con-
stitution of 1848, which was in force when the franchise was
granted, to tax the corporations for the use of their franchise;
that is, a tax which is entirely independent of the value of
the cars, tracks, and other tangible property of the corpora-
tions, and so treated by the constitutions of 1848 and 1870.
But there are many difficulties with this branch of the sub-
ject.    There are certain conditions required by the constitu-
tution of 1870 as prerequisites to the imposition of a tax of
this kind, even conceding that the legislature has authorized
the city to impose the tax, and I therefore, without giving
any decided opinion upon that part of the case, prefer to
place my decision upon another ground, and to sustain the
ordinance as a regulation of the police power of the city.
This is always a subsisting power, which, it is generally held,
cannot be transferred by the city, but is inherent in its munic-
ipal organization.    There can be no controversy about the
power of the city over many things connected with the opera-
tion of the city railway.    Admitting that because of the price
of fare agreed upon there can be no change in that, yet, by
virtue of its police power, the city can, to a great extent,
regulate the running of the cars, prescribe rules and laws as
to speed, stoppage, and other things connected with the
operation of the railway.    This has not been questioned by
the counsel of the plaintiff; but it is claimed this cannot
be considered a police regulation, because it is manifestly
the exercise of the taxing power of the city.    It is argued

that the price of the license is so large that the intent is manifest. It is very difficult to lay down any absolute rule upon this subject, and to hold that a particular sum may be within the police power of the city, and another sum beyond the power, and a mere tax.

By the general law of 1872, for the incorporation of cities and villages in this state, it is provided that the city council in cities shall have authority to license hackmen, draymen, omnibus drivers, cabmen, expressmen, and all others pursuing like occupations, and to prescribe their compensation. This was obviously intended as conferring a police power upon the city council in relation to the various classes named in the statute. This is a power that has been uniformly exercised, and, construing the statute literally, cannot well be questioned. But it is claimed it does not include the street railway, because it is not pursuing an occupation like any of those named.

Omnibuses may be licensed. They may pass over even the same streets as those occupied by the horse railways, and they may carry passengers in the same manner. The only distinction which can be called substantial between the two classes of occupation is that one carriage goes upon iron rails, in a regular track, with wheels, and the other carriage goes with wheels upon the ordinary street way.

The supreme court of Pennsylvania has held that these street-railway carriages are of a like nature as omnibuses, and there can be no doubt, I think, of the right of the city to demand a license from all omnibus drivers, and to include every omnibus which may belong to a particular company or corporation, and to require the payment of a license for such omnibus that may be so owned and used.

The court of appeals of New York, in the case of *Mayor* v. *Second Avenue R.* 32 N. Y. 261, held that an ordinance of the city of New York, in many respects like this, was invalid, as an attempt, through color of a license, to impose a tax upon the railroad company, refusing to treat it as an exercise of the police power of the city. The price charged in that case for the license was the same as in this.

In the case of *Frankfort & Philadelphia Passenger Co.* v. *City of Philadelphia*, 58 Pa. St. 119, where the license fee was the same, and *Johnson* v. *Philadelphia*, 60 Pa. St. 445, the supreme court of Pennsylvania took a different view of such an ordinance, and treated it as a police regulation merely; and such seems to be the view of the supreme court of this state in the case of the *Chicago Packing & Provision Co.* v. *City of Chicago*, 88 Ill. 221.

In the case of *Frankfort & Philadelphia Passenger Co.* v. *City of Philadelphia*, the city obtained its power to impose the license from a statute substantially similar to that under which the city of Chicago claims the power in this case.   In that case the act of the legislature declared that the city council of Philadelphia should have authority to provide for the proper regulation of omnibuses, or vehicles in the nature thereof, and to this end "it shall be lawful for the council to provide for the issuing of licenses to such and so many persons as may apply to keep and use omnibuses, or vehicles in the nature thereof, and to charge a reasonable annual or other sum therefor."   In that statute the words "vehicles in the nature thereof," in this the words "pursuing a like occupation," are used.   I cannot see that there is any substantial distinction in that respect between the two statutes.

In the case of 88 Illinois, already referred to, the corporation was organized and doing business under the laws of this state.   A question arose in that case as to the power of the city to issue a license.   It was denied in the argument of the case that the power existed, but the supreme court held that, under the power "to regulate the management" of the business, the city had the right to issue a license and to prescribe the compensation.   That was also under the same law—the act of 1872—which conferred power upon cities to grant licenses and regulate omnibus drivers, and all others pursuing a like occupation, and to prescribe their compensation. The supreme court of this state decides in that case that the power to require a license is one of the means of regulating the exercise of a pursuit or business; that there are other means that might be adopted to accomplish the purpose, but

that these municipal authorities are not restricted as to the means that they shall employ to regulate the business; and various authorities are cited by the court in support of the view which they take, and they repeat the ruling which had been previously made, that a license was not, in the constitutional sense of the term, a tax.

The supreme court must also have considered and passed upon a question which has been discussed in this case, namely, whether or not the act which gave the authority to the city to license was a general law under the constitution of this state; and they held that it was, and that it was intended to apply to all cities which might adopt it. It is true that was a case of licensing a business which was generally admitted to be injurious in its character to those near the place where it was carried on; but it was a question of power, and the point in controversy was whether the city of Chicago had the right to exercise the power of licensing. The license fee demanded in that case was $100. It seems to me that the question involved in this case arose substantially in that, and it was decided by the supreme court of the state that it was a valid exercise of the power to regulate a particular business. That is also the view taken by the supreme court of Pennsylvania in the cases referred to. In view of these decisions, and of several decisions of the supreme court of the United States within the last few years, (*Munn* v. *Illinois*, 94 U. S. 113, and others,) I think the weight of authority is in favor of regarding this as a police regulation.

One of the difficulties I have had with the case has been whether it ought not to be regarded as a tax for revenue under the form of a license. It may be conceded that the argument is strong for treating it as a revenue measure; but, as I before stated, there are some objections which I consider very weighty, and which would prevent me at this time from placing the decision on that ground. It may be admitted that, viewing it as a police regulation requiring the payment of a fee for the license, in amount it goes to the very verge of the exercise of police power; but as other courts have held that such a tax did not exceed that limit, I cannot hold that

it does in this case; and therefore I shall, as at present advised, sustain the ordinance in question as a valid exercise of the police power of the city council.

There have been some arguments used by counsel which, I think, do not properly apply to the pleadings. It is insisted that the court must construe this as a tax, and not a mere police regulation. It is admitted that the court of appeals of New York did construe a similar license fee as a tax. The supreme court of Pennsylvania has given a different construction, and held it to be a police regulation. There is nothing in the bill by which the court can regard it absolutely as the exercise of the taxing power of the city. There is nothing in the bill which would authorize the court to hold, if it were a tax, that it was in violation of the constitution of 1870, as not being uniform upon the particular class on which it operates. It is urged that it cannot be treated as a tax, because, if so, it would not be within this requisition of the constitution of 1870, because the street railways come in direct competition with some of the steam railways; as that of the Illinois Central and the Northwestern to Hyde Park and Evanston. There is nothing in the pleadings which would warrant the court in considering these facts, unless the court should take judicial notice that they do thus come in competition, without any allegation in the pleadings. Under the authorities, and upon the statements contained in the pleadings, the court cannot necessarily construe this as a tax. The court is at liberty, I think, to construe it as a police regulation.

These views have been given for the purpose of enabling the parties, if they desire, to take the case to the supreme court of the United States. The district judge who heard the application for an injunction in the first instance, and granted it, is inclined to hold, as I understand, that this was not the proper exercise of the police power. I hold, for the purpose of deciding the case, that it is; and if the case is to be determined by the pleadings as they at present stand, it can be certified up to the supreme court as upon a division of opinion between the judges. If, however, the counsel

desire to raise some of the questions which have been discussed in the argument, I think it would be advisable for them to amend the bill; and, if they wish, leave will be granted for that purpose.