John H. CAMPBELL, Isadore Head and Cornelius E. Scott, individually and on behalf of all others similarly situated, Plaintiffs,

v.

The CITY OF CHICAGO, Yellow Cab Company and Checker Taxi Company, Inc., Defendants.

No. 83 C 3884.

United States District Court, N.D. Illinois, E.D.

July 28, 1986.

Michael T. Hannafan, Janet M. Koran and Steven P. Handler, Hannafan & Handler, Ltd., Chicago, Ill., for plaintiffs.

Robert W. Fioretti, Arthur N. Christie and James D. Montgomery, City of Chica-

go, Jeremiah Marsh, Michael Schneiderman and William Carlisle Herbert, Hopkins & Utter, Chicago, Ill., for City of Chicago.

Harold C. Hirshman, Kenneth H. Hoch and Stuart Altschuler, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Yellow Cab Co. and Checker Taxi Co., Inc.

## ORDER

NORGLE, District Judge.

This antitrust case is before the court on cross motions for summary judgment. Plaintiffs, cab drivers in the City of Chicago, have brought this action against defendants, the City of Chicago ("City"), Yellow Cab Company ("Yellow"), and Checker Taxi Company, Inc. ("Checker") claiming violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The action is brought by several individual plaintiffs and on behalf of a class consisting of all persons who have held Public Vehicle Chauffeur's Licenses issued by the City and who have leased or subleased taxicabs of licenses/medallions during the relevant period of this action.[1] Defendants advance a number of theories in support of their motions but rest primarily on the "state action" and *Noerr-Pennington* doctrines in defense of this action. Plaintiffs urge judgment in their favor on the liability issue in their section 1 count. For the following reasons, defendants' motions are granted and plaintiffs' motion is denied.

The central focus of this litigation is the City's enactment in 1963 of an ordinance regulating the manner of acquiring and holding taxicab licenses and their number. Chicago Municipal Code, Public Passenger Vehicles § 28–22.1(a) *et seq.* This ordinance arose out of a settlement among the City and Yellow and Checker over damage claims in 1963. The ordinance has been amended several times since then,[2] but

those amendments do not alter the allegedly offending aspects of the ordinance.

City argues primarily the state action immunity from antitrust liability. *Cf. Parker v. Brown*, 317 U.S. 341, 350–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943). In *Parker*, the Supreme Court held that the federal antitrust laws were never intended to encompass the individual states' regulatory actions. Underlying this conclusion are the traditional concerns of federalism and state sovereignity. The Sherman Act was intended to prohibit private restraints on trade, and the court refused to extend that prohibition to the acts of a state legislature. *Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313–14. It was long-assumed that *Parker* immunity applied to municipalities and local governments as well. *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 228–29 (7th Cir.1975) (extending *Parker* to a municipality prior to *City of Lafayette*). See generally Report to the Senate Committee on the Judiciary on the Local Government Antitrust Act, S.Rep. No. 593, 98th Cong., 2d. Sess. 1 (1984) (concluding that "it was generally assumed that the 'state action' doctrine applied not only to States, but to local units of government as well"); *see also* H.R. 6027, 98th Cong., 2d. Sess 130 Cong. Rec. H8471 (daily ed. August 6, 1984) (same), U.S.Code Cong. & Admin.News 1984, p. 4602.

■ The Supreme Court's decisions in *City of Lafayette, Louisiana v. Louisiana Power & Light Co.*, 435 U.S. 389, 408, 98 S.Ct. 1123, 1134, 55 L.Ed.2d 364 (1978) and *Community Communications Co. v. City of Boulder, Colorado*, 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982), however, made clear that municipalities as such do not share the state's immunity from antitrust laws. Only where the state legislature has granted specific, affirmative au-

---

1. In an earlier order, Judge Decker denied plaintiffs' motion to certify the class. Plaintiffs have subsequently filed a motion with this court for reconsideration of that order or alternatively to permit the joinder of individual cab drivers as additional plaintiffs. In light of the order the court enters today it is unnecessary to address these pending motions.

2. The particular ordinance has been amended, often with minor changes, eighteen times since its passage in 1963. *See* Appendix *Yellow and Checker's Memorandum in Support of Their Motion for Summary Judgment.*

thority to the local government to regulate in a defined area, does the state's antitrust immunity extend to municipalities. *City of Lafayette*, 435 U.S. at 413–14, 98 S.Ct. at 1136–38 (anticompetitive conduct of municipality must be performed pursuant to state policy to displace competition with regulation or monopoly public service); *Boulder*, 455 U.S. at 51, 102 S.Ct. at 840 (home rule authority insufficient; local government's action must be pursuant to "clearly articulated and affirmatively expressed" state policy).

▪ The Supreme Court has recently reaffirmed the *Boulder* articulation as the proper test. In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 1717, 85 L.Ed.2d 24 (1985) the Court identified the two-part inquiry local government entities must satisfy to claim immunity from antitrust laws:

> It is therefore clear from our cases that before a municipality will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy.

Moreover, the local government's conduct must be a "forseeable result of empowering" the local entity to regulate in the field; the anticompetitive effects and regulatory action of the municipality must have been "contemplated" by the legislature. *Town of Hallie*, 105 S.Ct. at 1719. As the Seventh Circuit recently stated:

> In considering the ... alleged [anticompetitive] conspiratorial acts we will first determine whether any legislative act(s) authorizes the challenged conduct and then determine whether anticompetitive effects are a forseeable result of the authorization. An affirmative determination to both questions will lead us to

conclude that the state intended the localities' challenged conduct to be exempt from federal antitrust laws.

*LaSalle National Bank of Chicago v. County of DuPage*, 777 F.2d 377, 381 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986).

It is not seriously disputed that the City was authorized to enact the challenged ordinance. The City points to Ill.Rev.Stat. ch. 24, § 11–42–6 (1983) as authorizing the enactment of the ordinance. Section 11–42–6 states in its entirety:

> The corporate authorities of each municipality may license, tax, and regulate hackmen, draymen, ominibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and may prescribe their compensation.

This provision was enacted as part of a general grant to municipalities of the power to regulate certain, defined areas of commerce in the exercise of their police powers to protect the health and safety of its residents. *See generally* Ill.Rev.Stat. ch. 24 §§ 11–42–1 to 11–42–10 (including regulation of auctioneers, brokers, barbers, ice-cream parlors, detective agencies, bowling alleys, junk yards, pawnbrokers, packing houses, tanneries, blacksmiths and other "unwholesome" businesses).[3]

Section 11–42–6 has been interpreted to permit a municipality to regulate the use of its streets and to impose conditions and restrictions on their use. *Allerton v. City of Chicago*, 6 F. 555 (Cir.Ct.N.D.Ill.1880); *Atchison, T. & S.F. Ry. Co. v. City of Chicago*, 136 F.Supp. 476 (N.D.Ill.1956), *rev'd on other grounds*, 240 F.2d 930 (7th Cir.1957), *aff'd*, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). The powers granted under the Act have been held to include the regulation of safety measures used in tax-

---

**3.** In *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir.1975), the Seventh Circuit considered section 11–42–11 of the Municipal Code, worded almost identically to the provision in question here. *Compare* § 11–42–11 (granting corporate authorities to the power to license, franchise and tax the "business of operating a community antenna television system") *with* § 11–42–6 (same authority over cabmen

and other, similar occupations). The court found the legislative provision granted the authority to the City of Rockford to create a monopoly of cable television in Rockford in favor of a single private company. The court had no occasion to discuss the *City of Lafayette* forseeability test, because *Metro Cable* was decided three years before *City of Lafayette*.

is, *City of Chicago v. Dorband,* 297 Ill. App. 617, 18 N.E.2d 107 (1938), the method of issuing new licenses, *Yellow Cab Co. v. City of Chicago,* 23 Ill.2d 453, 178 N.E.2d 330 (1961); *People v. Thompson,* 341 Ill. 166, 173 N.E. 137 (1930), and the total number of licenses that may be issued. *Yellow Cab Co. v. City of Chicago,* 396 Ill. 388, 71 N.E.2d 652 (1947) (right to regulate traffic includes right to restrict number of taxicabs operating on City streets). All of this is well-established law.

Pursuant to these broad powers, the City enacted the first comprehensive taxicab ordinance in 1934. Under the terms of that ordinance the total number of licenses was limited to 4,108 with 2,166 going to Yellow and 1,500 going to Checker. In 1937, the total number of licenses was voluntarily reduced and in 1945, the 1937 ordinance was extended to 1950. In 1946, the City increased the total number of licenses without regard to a priority provision agreed upon at the time of the voluntary surrender of licenses. The Illinois Supreme Court declared the increase invalid stating the priority provision had to be honored. *Yellow Cab Co. v. City of Chicago,* 396 Ill. 388, 71 N.E.2d 652 (1947). Between 1952 and 1957, both Yellow and Checker pursued damage actions for violations of the priority provision upheld in the 1946 suit. As part of the settlement negotiations, the ordinance now in question was enacted in 1963.[4]

Plaintiffs object to four aspects of the ordinance: first, they object to the limit on the number of licenses available under the ordinance (§ 28.22.1(a)) (4,600 total, 2,666 to Yellow, 1,500 to Checker); second, the provision in the act which permits the calling of a hearing (to decide whether new,

additional licenses are necessary) to be made by a majority of current license holders (§ 28–22.1(c)); third, the provision which requires new licenses to be awarded in proportion to the numbers currently held (assuring Yellow and Checker an allegedly perpetual right to 80% of the licenses (§ 28–22.2(d)(I)); and four, the provision permitting new licenses to be awarded only in the manner prescribed above (§ 28–31.1). These provisions have been in effect since 1963. The number of licenses has never been increased from the 4,600 awarded in 1963.

Plaintiffs initially argue that while the statute may permit regulation, licensing, and taxation of the taxicab industry, the act does not authorize the particular scheme of monopoly, resulting from a privately negotiated agreement (that is, an agreement among the principal powerbrokers of the City government), granting a perpetual monopoly to the two private taxicab companies involved in this case. The argument appears to be that while the statute may immunize some anticompetitive conduct, it cannot authorize the more blatant forms of monopolistic rapacity demonstrated by this ordinance. In essence, plaintiffs argue the broadly worded, general authorizing statute cannot justify the excessive and detailed regulation contained in the ordinance.

█ To the extent plaintiffs are arguing that there is a third requirement to the test, *i.e.,* that the conduct not only be authorized and forseeable, but that the exact consequences be foreseen and contemplated, this argument was rejected in *Town of Hallie.* The plaintiffs ("the Towns") in *Town of Hallie* contended that the statutory provision did not evidence a state poli-

---

**4.** The parties dispute whether there was an actual "agreement" or "contract" between representatives of Yellow and Checker and the City. *See 12(e) Statement of Undisputed Facts ¶¶ 21–26; City of Chicago's 12(f) Statement of Genuine Issues ¶ 21–29.* The City contends that Yellow and Checker agreed to drop their damage claims if the City enacted an ordinance, drafted by Yellow and Checker and admittedly giving Yellow and Checker 80% of all the licenses. Plaintiffs claim that the three parties reached an agreement, a contract which gave enforceable

rights to Yellow and Checker and which Yellow and Checker are suing to enforce. For the reasons discussed later with reference to the *Noerr-Pennington* doctrine, this dispute over the conclusions to be drawn from essentially admitted facts does not raise a genuine issue precluding the grant of summary judgment. It is undisputed that as part of settlement negotiations, Yellow and Checker submitted a proposed ordinance, which was debated by the City Council, and enacted shortly thereafter. The claims for damages were subsequently dismissed.

cy to displace competition, and therefore, the City was not immune from antitrust liability. In expressly rejecting a requirement of anticipating particular anticompetitive effects the Court noted:

> It is not necessary, as the Towns contend, for the state legislature to have stated explicitly that it expected the City to engage in conduct that would have anticompetitive effects.... [I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it is clear that anticompetitive effects logically would result from the broad authority to regulate.

*Town of Hallie*, 105 S.Ct. at 1718; *see also Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 1731, 85 L.Ed.2d 36 (1985) (State's failure to describe the implementation of its policy in detail will not subject program to antitrust laws); *LaSalle National Bank*, 777 F.2d at 383. Simply put, if anticompetitive effects are foreseeable from the authorizing statute, the particular anticompetitive conduct is foreseeable, no matter how monopolistic or what particular form it takes. *Town of Hallie*, 105 S.Ct. at 1718–20 (permitting the City of Eau Claire to deny sewage system unless surrounding

towns agreed to annexation). Thus, the central issue remains whether the statutory provision objectively authorizes conduct that forseeably results in anticompetitive conduct. *LaSalle National Bank*, 777 F.2d at 383.

▄ The best place to begin in ascertaining what the legislature contemplated in enacting the authorizing statute is the language of the Act itself. Section 11–42–6 permits the municipality to "license, tax, and regulate [taxicab operators] and [to] prescribe their compensation." Ill.Rev. Stat. ch. 24, § 11–42–6 (1985). There are few other powers a municipality has in carrying out economic regulation than those contained in this section.[5] These unqualified powers could equally forseeably be utilized to create a market of many cab companies, a few, or even a single company. Thus, it is foreseeable that the City could create a system giving two companies 80% of the market and leaving the rest of the market to other competitors. It is equally foreseeable that the City could fix the supply of cabs at a certain level, thereby artificially raising the value of a single license and ultimately prescribing the compensation that taxi drivers can receive while remaining a profitable, ongoing enterprise.[6]

---

**5.** The powers to tax, license, and regulate necessarily imply limitations on a free market economy. *See* Easterbrook, *Antitrust and the Economics of Federalism* 26 J. Law & Econ. 23, 23, 27–29 (1983) ("Regulation displaces competition.... Sometimes legislation may be justified as necessary to correct 'imperfections' in the market, but in most cases legislation is designed to defeat the market altogether.") Limitations on the number of taxicabs that may operate at any one time, prescribing the rate of compensation, setting qualifications for drivers, fixing the level of profits, fares, and passenger occupancy have the clear effect of eliminating certain, weaker competitors and favoring others while altering the demand for taxi service and curtailing the available supply of taxis.

While there is little contemporary legislative history of the passage of the authorizing statute, one commentator has identified several of the original city purposes in enacting the earliest restrictions on carriers. The regulations had the objectives of 1) raising revenue through license fees; 2) limiting contracting terms to prevent extortionate rates; 3) organizing the flow of cabs in traffic; 4) imposing minimum stan-

dards on conditions and appearances of vehicles; 5) ensuring responsible and law abiding drivers; and 6) ensuring financial responsibility of drivers and companies. *See* Kitch, Isaacson & Kasper, *The Regulation of Taxicabs in Chicago*, 14 J. Law & Econ. 285, 302–16 (1971). These police power concerns, each of which would implicate restrictions on the free market, were apparent to the state legislature when it enacted § 11–42–6, expressly permitting the City the authority to regulate the taxi industry to carry out these local concerns.

**6.** Two other purposes, to ensure adequate profits for taxi owners and adequate earnings for drivers, were advanced to justify the most restrictive entry controls during the 1920's. Kitch, Isaacson & Kasper, *supra* note 5, at 302, 316–17. In 1937, the taxi drivers struck. As part of that settlement, the drivers were given greater commissions and a five cent increase in the flag pull charge. *Id.* at 326. The City's power, given by statute to "prescribe the compensation" drivers were to receive, supported the creation of entry controls. The limitations on the number of licenses operating at any one time, and the fixing of fares resulted in anticom-

It is precisely the breadth of the provision, argue plaintiffs, that makes it an improper source on which to base the ordinance. They argue that it is also foreseeable that a municipality will only minimally exercise its powers to tax and regulate and will create an open and free market. In that regard, the statute is neutral as to the creation of anticompetitive effects and therefore provides insufficient authorization. *Cf. City of Boulder,* 455 U.S. at 56, 102 S.Ct. at 843.

In *City of Boulder,* the Colorado Home Rule Amendment of the Colorado constitution permitted home rule communities to exercise the "full right of self-government in both local and municipal matters." Pursuant to this authority the City Council enacted an ordinance granting a private company (plaintiff) a 20 year, revocable, nonexclusive permit to conduct a cable television business within city limits. Later, in response to the growing accessibility of cable television through technological advances, the City passed an ordinance prohibiting plaintiff from expanding its business to other areas of the City. In concluding that the ordinance was not enacted pursuant to a clearly articulated and affirmatively expressed state policy, the Court emphasized the breadth of the home rule authorization giving the City of Boulder "every power theretofore possessed by the legislature ... in local and municipal affairs." *City of Boulder,* 455 U.S. at 53–54, 102 S.Ct. at 841–842. As the court stated:

> A state that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought.... Acceptance of such a position—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require.

■ In *Town of Hallie* the plaintiffs relied on the neutrality language of *City of Boulder* to argue that a Wisconsin statute which authorized the City of Eau Claire to build or repair sewerage systems including the right to refuse unannexed areas, did not evidence a state policy to displace competition because it did not encourage anticompetitive conduct. The court found the attempted analogy to *City of Boulder* unconvincing. In distinguishing *City of Boulder's* authorizing statute from Wisconsin's statute the court stated:

> The Amendment simply did not address the regulation of cable television. Under Home Rule the municipality was to be free to decide *every aspect* of policy relating to cable television *as well as policy relating to any other field of regulation of local concern.* Here, in contrast the State has specifically authorized Wisconsin cities to provide sewage services and has delegated to the cities the express authority to take action that foreseeably will result in anticompetitive effects.

*Town of Hallie,* 105 S.Ct. at 1719 (emphasis added). The State of Illinois has likewise specifically authorized Illinois cities to regulate taxi service within their boundaries and has provided them with the express authority to take action which may result in anticompetitive effects. Even though a monopoly is not the inevitable or compelled[7] result of the delegation of authority it is clearly a foreseeable one. That foreseeability satisfies the state action test and clothes the municipality with the legislature's immunity from antitrust liability. *LaSalle Nat'l Bank,* 777 F.2d at 382; *Wellwoods Dev. Co. v. City of Aurora,* 631 F.Supp. 221, 223–24 (N.D.Ill.1986).

Several other factors support the conclusion that the legislature contemplated the anticompetitive conduct challenged here. First, the particular service and governmental interests involved (exercise of the state's police power to protect the health,

---

petitive effects and are a foreseeable consequence of the power to set the compensation of drivers.

**7.** While it is the best indication of expected anticompetitive results, compulsion by the legislature is not necessary to satisfy the state action defense. *Town of Hallie,* 105 S.Ct. at 1710.

safety and welfare of drivers, passengers and pedestrians on the city streets, through the use of regulation to control the safe operation of taxicabs and limit their numbers), necessarily implicate some restrictions on free market forces. Concern for public safety and the public welfare may forseeably not be served by unrestrained economic competition.[8] It is not surprising to find state legislatures granting the authority to municipalities to regulate similar service areas where the public safety, more directly a matter of local concern, is implicated.[9] *See generally* Ill.Rev.Stat. ch. 24, § 11–42–1 to 11–42–10 (cited earlier—listing activities implicating the public health and safety); *Wellwoods Dev. Co.*, 631 F.Supp. at 225–26 (authority over airport expansion and development of runways); *Unity Ventures v. County of Lake*, 631 F.Supp. 181, 190 (N.D.Ill.1986) (sewage treatment and expansion); *Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.*, 760 F.2d 607 (5th Cir.1985) (supplying taxi service to the airport); *Woolen v. Surtran Taxicabs, Inc.*, 615 F.Supp. 344 (N.D. Texas 1985) (airport taxicab service); *Central Ambulance Service, Inc. v. City of Dallas*, 631 F.Supp. 366 (N.D.Tex.1986) (emergency ambulance service).

Moreover, Ill.Rev.Stat. ch. 24, § 1–1–10 (1985) states plainly that

§ 1–1–10. It is the policy of this State that all powers granted, either expressly or by necessary implication, by this Code, other Illinois statute, or the Illinois Constitution to non-home rule municipalities may be exercised by those municipalities notwithstanding effects on competition. It is further the policy of this State that home-rule municipalities may (1) exercise any power and perform any function pertaining to their government and affairs or (2) exercise those powers within traditional areas of municipal activity, except as limited by the Illinois Constitution or a proper limiting statute, notwithstanding effects on competition.

It is the intention of the General Assembly that the "State action exemption" to the application of federal antitrust statutes be fully available to municipalities to the extent their activities are authorized by law as stated herein.

An amendment to the Act, effective July 1, 1986, makes clear that the Act specifically refers to § 11–42–6. Ill.Rev.Stat. ch. 24, § 1–1–10(b). The Act further states:

The "State action exemption" for which provision is made by this Section shall be liberally construed in favor of such municipalities and the agent, employees and officers thereof, and such exemption shall be available notwithstanding that the action of the municipality or its agents, officers or employees constitutes an irregular exercise of constitutional or statutory powers. However, this exemption shall not apply where the action alleged to be in violation of antitrust law exceeds either (1) powers granted, either expressly or by necessary implication, by Illinois statute or the Illinois Constitution or (2) powers granted to a home rule municipality to perform any function pertaining to its government and affairs or to act within traditional areas of municipal activity, except as limited by the Illinois Constitution or a proper limiting statute.

This last section is really an attempt to codify controlling Supreme Court precedent. (The exceptions in subparagraphs 1

---

**8.** *See LaSalle Nat'l Bank,* 777 F.2d at 382 (economic competition is "one of the chief obstacles to pollution control"); *Wellwoods Development,* 631 F.Supp. at 226 (safety is "both literally and figuratively placed first" in Illinois aeronautics; safety would be "adversely affected by the unrestrained play of market forces.") In neither case was competition considered the preeminent or exclusive goal of the state authorization to regulate.

**9.** It is clear that the regulation of taxi service is a matter of local concern implicating the protection and safety of the public, *Golden State Transit Corp. v. City of Los Angeles,* 726 F.2d 1430, 1434 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985); *Yellow Cab Co.,* 396 Ill. at 397, 71 N.E. at 657, and in such areas, the tension caused by the national interference with local regulation is greatest. *Town of Hallie,* 105 S.Ct. at 1719 n. 7; *see generally Easterbrook, supra,* note 5, at 22–25.

and 2 state the rules of law in *Town of Hallie* and *City of Boulder*).

The passage of this Act, of course, cannot alone provide the support necessary to satisfy *Town of Hallie* and *LaSalle National Bank's* requirement of authorization of specific conduct with forseeable anticompetitive effects. But it does reveal an intention on the part of the State legislature to permit local government to regulate freely in particular areas of local concern.[10] It most definitely demonstrates that anticompetitive conduct and effects are not only contemplated by the legislature but anticipated, thus the need to immunize local government from antitrust liability. The most recent amendments specifically detail certain authorizing enactments falling within its purview of needed protection; the authorizing provision in question here is within the enumerated provisions. *See also Wellwoods Dev. Co.*, 631 F.Supp. 221, 226–27 (N.D.Ill.1986) *and Richard Hoffman Corp. v. Integrated Building Systems, Inc.*, 581 F.Supp. 367, 372 (N.D.Ill. 1984) (both relying on § 1–1–10 to support the conclusion of municipal immunity).

Further, the first monopolistic scheme in the Chicago taxi system was passed in 1934. During the next fifty years some form of anticompetitive scheme remained in effect in Chicago. This half century of regulation of the taxicab industry continued without any change in the legislative scheme. In 1941 and again in 1961 the legislature revised the Municipal Code without disturbing the authorization to municipalities to regulate the taxicab industry. The provision first enacted in 1871 remains the law today. If the legislature had truly hoped for a free market and unfettered competition to reign in the taxicab industry only to see its hopes dashed by a thoroughly anticompetitive ordinance in the state's largest taxicab market, then the legislature would surely have changed its authorization. But it did not. The only inference from this legislative countenance of an anticompetitive scheme was that the creation of a monopoly was not only foreseen and contemplated, but expected and anticipated.[11]

Because the court finds the legislature authorized the enactment of the ordinance in question and foresaw the anticompetitive effects that would arise from its delegation of authority, the court concludes that the City of Chicago's conduct is immune under the state action defense.

■ Yellow and Checker have moved for summary judgment based on the *Noerr-Pennington* doctrine. *Cf. Eastern Railroad Pres. Conf. v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *Noerr-Pennington* provides an exception to antitrust liability enabling citizens or business entities to petition public

---

**10.** Plaintiffs argue these provisions may not be used to bar this action because they were enacted after the filing of the complaint. The ordinance was enacted in 1963, but the effects of that conduct, allegedly constituting violations of the antitrust laws, continue to the present (as does the ordinance). The court need not decide the question of retroactivity today, however, because the Illinois act is not used to bar any part of this claim. The court only cites these provisions, in the absence of any contemporary legislative history, as revealing what the legislature foresees in empowering municipalities to regulate in certain areas. Present-day enactments, worded almost identically to those enacted in 1881, are thought to have logically forseeable anticompetitive effects as is § 11–42–6. While such anticipated results alone are insufficient to authorize the conduct in question, the court thinks it useful and relevant in understanding the legislative meaning of the authorizing provision.

**11.** *See generally* Kitch, Isaacson & Kasper, *supra* note 5, at 286–89, 316–35 (reciting the long history of intensive regulations of the taxi industry in Chicago from the turn of the century to the enactment of the 1963 ordinance). These authors criticize the courts for playing an "important and continuing role in legitimizing the regulation." *Id.* at 344. Nonetheless, they recognize the Illinois courts have consistently upheld anticompetitive schemes concluding that the City was authorized by the state statute to engage in such regulation. Again, while the Illinois courts' opinions do not decide the question facing this court, they are "instructive on the question of the state legislature's intent in enacting the statutes relating to the municipal [regulation of the taxi industry]." *Town of Hallie*, 105 S.Ct. at 1719 n. 8.

officials to take certain actions or enact certain provisions. *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566 (5th Cir.1984) (en banc). *Noerr-Pennington* is rooted in the first amendment right to petition government, and "genuine efforts to induce government to take such lawful action are beyond the Sherman Act." *Metro Cable Co.,* 516 F.2d at 224; *Wilk v. American Medical Ass'n,* 719 F.2d 207, 230 (7th Cir.1983).

As the court has stated:

Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

*United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *see also California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

While the state action and *Noerr-Pennington* defenses have independent roots, it is clear that they are interrelated in a practical sense. *Independent Taxicab Drivers' Employees,* 760 F.2d at 613 & n. 10. As the court indicated in *Independent Taxicab Drivers':*

Yellow secured from the City an exclusive concession whose anticompetitve effects stem primarily from a valid municipal, and vicariously state, policy. It would be anomalous to hold on the one hand that government can contract with private entities to effect valid, albeit anticompetitive, policies, while holding on the other hand that private entities cannot petition government to participate in the public endeavor.

*Independent Taxicab Drivers' Employees,* 760 F.2d at 613; *Metro Cable Co.,* 516 F.2d at 229–30; 1 P. Areeda & D. Turner, *Antitrust Law,* ¶¶ 201, 204d, 204e (petitioning done in the legislative context should be immune even if improper; if lobbying is successful, should be ignored outright).

In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) the Court created the "sham" exception to the doctrine. Where a defendant engages in a "pattern of baseless, repetitive claims" which appear designed to suppress competition through harassment, *Noerr-Pennington* will not protect defendant from antitrust liability. "Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression'." *Id.* at 513, 92 S.Ct. at 613; *see also Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 472 (7th Cir. 1982) (defendant's purpose in pursuing litigation is not to win suit or gain favorable judgment but to harass competitors and deter others through the process of litigation). The Seventh Circuit recently discussed the critical motive:

Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation ... a sham. That anticompetitive motive is the very matter protected under *Noerr-Pennington.* Rather, the prerequisite motive for the sham exception is the intent to harm one's competitors not by the *result* of the litigation but by the simple fact of the *institution* of the litigation.

*Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262–64 (7th Cir.1984).

In the purely legislative context, the right to petition freely-elected representatives is given greater latitude. *Noerr Motor Freight,* 365 U.S. at 132, 81 S.Ct. at 526; *California Motor Transport,* 404 U.S. at 516, 92 S.Ct. at 614 (Brennan, J., concurring); *Metro-Cable Co.,* 516 F.2d at 229–30. In *Noerr Motor Freight,* the conspirators sought and obtained legislative action through a false anti-truck advertising campaign. Despite the false nature of the campaign, designed to harm the trucking industry, the Court found the actions of the private parties were immune from antitrust liability. *Noerr Motor Freight,* 365 U.S. at 136, 81 S.Ct. at 528. In *Metro Cable,* unethical conduct by the conspirators (misrepresentations, making campaign contributions to specified legislators) did not remove their conduct from the *Noerr-*

*Pennington* immunity. *Metro Cable*, 516 F.2d at 230–32. Nor does the conduct of the conspirators become subject to antitrust liability where the conspirators persuade a member of a legislative body to agree with their position. *Id.* at 230. *See generally* P. Areeda & D. Turner, *supra,* at ¶ 204c.

■ Under either the legislative or judicial tests, Yellow and Checker's conduct is immune from antitrust liability. Yellow and Checker sued the City of Chicago for damages arising out of the City's violation of the 1937 ordinance. The lawsuits sought over $20 million in damages. At the same time, Yellow initiated the process of obtaining a fare increase. After a hearing, the Committee on Local Transportation of the City Council recommended a fare increase of 6%. Action on the fare increase was deferred pending resolution of the damage actions against the City. (*See* Ex. F–H).

In early 1963, Mayor Daley met with the representatives of Yellow and Checker to discuss how the damage claims could be settled. Yellow offered to drop the damage claims in exchange for an ordinance favorable to Checker and Yellow. Robert Samuels, President of Yellow Cab, sub-

mitted a proposed draft ordinance. A number of small changes were made and the ordinance was sent to the Committee on Local Transportation. (Ex. I & J).

The Committee then held public hearings to consider the ordinance. During the hearings, testimony of witnesses revealed the manner in which the ordinance was drafted and the proposed *sine qua non* to the ordinance (the dropping of the damage claims) was openly discussed. (Tr. 124–146). Each of the particular provisions was discussed. The provision in the ordinance preventing any amendments was proposed to provide stability to the taxicab industry. The Committee focused on the immediate fare increase the companies argued they needed to remain profitable. A number of changes to the ordinance (not relevant to the present suit) were made and on July 1, 1963 the ordinance was enacted by the full City Council.[12] The damage claims against the City were dropped.

The Court finds plaintiffs' characterization of the activities of Yellow, Checker, and the City as a privately-negotiated settlement agreement between Yellow, Checker, and the City is not supported by the evidence and in any event misses the point.[13] The plaintiffs' do not contest the

**12.** Plaintiffs contend that the hearings on the ordinance before the Committee on Local Transportation and the subsequent enactment of the ordinance by the City Council are insignificant for purposes of this case because the agreement had already been made. Yet plaintiffs fail to note the hearings contained significant discussion of the ordinance, even though it was ultimately adopted largely unchanged. The City Council's enactment of the ordinance is not insignificant either. Despite agreements reached by any aldermen, the mayor, the corporation counsel or anyone else, they do not become the law of the City until and unless the City Council passes an ordinance though its regular legislative process. It is this undeniable fact, identified by Areeda & Turner as an impossibility of proof of causation of an antitrust injury, that encourages them to argue convincingly that all successful petitioning should be immune. P. Areeda & D. Turner, *supra,* at ¶ 204e.

**13.** Principally supporting plaintiffs' argument is its conclusion that the 1963 ordinance provisions grant a perpetual right to 80% of the licenses to Yellow and Checker. The court does

not so read the provisions. Section 28–33 of the ordinance prohibited amendment of the ordinance for five years. This provision was added to ensure stability to the new regulatory scheme. In 1968, this provision was extended for another five years. In 1973, the provision was not renewed. Thus the City remains free to amend the provisions of the ordinance. Plaintiffs also identify sections 28.22.1 and 28–31.1 regarding the issuance of new licenses to only be granted on a *pro rata* basis in accordance to the 80% monopoly currently held by Yellow and Checker. Plaintiffs argue that upon expiration of the broad prohibition against amendment of any aspect of the ordinance, the specific limitation on the issuance of new licenses contained in § 28–31.1 took over. It seems clear, however, that if the City has the power to do away with the general ordinance, it has the power to do away with any particular provision. *See Chirikos v. Yellow Cab Co.*, 87 Ill.App.3d 569, 43 Ill.Dec. 61, 65, 410 N.E.2d 61, 65 (1980) (council has right "to repeal the then existing ordinance or amend it as it saw fit.") In any event, the City cannot mephistophelian-like sell its police powers to a private company or anyone else. It maintains legislative authority to enact, amend,

validity of the ordinance. For example, Plaintiffs do not challenge the power of the City Council to enact the ordinance, or identify any procedural irregularity in its enactment. The defendants, Yellow and Checker, have not engaged in deceitful conduct, misrepresentations, otherwise illegal conduct, or unethical conduct. They sought a legal remedy for an established breach of contract. They agreed to drop that legal right in exchange for an ordinance favoring their position as already the two largest holders of licenses in the City. As the two largest holders they had the economic muscle to gain access to political leaders and to influence and persuade them that their proposed ordinance was beneficial to them and to the City. They prevailed.

As one commentator has noted:

The absence of an antitrust violation is most obvious when the petitioner actually obtains the result he seeks, and clearest in the case of legislation. Whatever the petitioner's objective, the enactment declares the public interest as perceived by the legislature. To be sure, the legislature may be mistaken or unaware of the consequences of its actions, or it may be responding to political pressures not truly reflecting "the public interest", but the antitrust court may not reappraise the legislature's assessment of the public welfare. Government is its own judge of how much competition is desirable. If a statute excludes everyone but the monopolist from a market, the monopolist cannot himself be faulted. Nor is there fault for requesting or otherwise promoting the legislation. Not only is petitioning protected, but the immediate cause of

the restriction on competition is the governmental action.

P. Areeda & D. Turner, *supra*, at ¶ 202b, at 38–39 (citations omitted). The City was free to reject the proposed ordinance. It was free to offer a more restrictive ordinance. But Yellow and Checker offered powerful persuasion and incentive to convince the City to adopt the ordinance it did.[14] The Court finds the agreement reached here no more atypical than any other lobbying effort made by a powerful lobbyist and the conduct of Yellow and Checker is clearly within the *Noerr-Pennington* immunity.

Nonetheless, plaintiffs insist the settlement agreement reached among Yellow, Checker, and the Corporation Counsel, approved by the Mayor and submitted to the City Council was merely ratified and given a "stamp of approval" by the City Council. But lobbyists often draft proposed statutes and persuade certain committees or agencies to recommend the statute before it is "ratified" by the legislative body itself. It merely becomes more compelling when the Mayor's office is the principal impetus for the legislative action. Ultimately, however, it remains for the City Council to accept or reject such a proposal; the legislative responsibility is with that body and whether the power to enact laws is exercised prudently or wisely in the final analysis is left to the voters.

### Conclusion

It is rarely the function of this or any court to judge the wisdom of state economic policies. A court may deplore the choice of economic alternatives made by a state

---

or repeal any statute consistent with the constitution. *See Phillips Petroleum Co. v. Jenkins,* 297 U.S. 629, 56 S.Ct. 611, 80 L.Ed. 943 (1936); *City of Chicago v. O'Connell,* 278 Ill. 591, 116 N.E. 210 (1917).

**14.** There is little question that Yellow and Checker, as holders of an overwhelming majority of the available licenses prior to the enactment of the 1963 ordinance, had considerable power to influence the enactment of an ordinance in its favor. Outside of its own market share, its greatest strength (and impediment to competition depending on the view) was its con-

trol of the flow of information regarding the operation of taxis. Most of the data demonstrating the need for limits on the number of cabs to favor stability, the need for financial integrity, or the need for fare increases or other operational limits was provided by the cab companies. The City, to a large extent, was forced to rely on Yellow & Checker's own assessment and calculation of the needs of the taxicab market in making its policy decisions. *See generally* Kitch, Isaacson & Kasper, *supra* note 5, at 342–47. Thus, the City naturally (if not wisely) accepted much of the economic justification that underlay the proposed ordinance.

**1512**

legislature that would permit the existence of certain monopolies and yet recognize that it is the prerogative of the state government to make that choice, free of interference from the national government. If the citizens of a municipality do not prefer the effects of a state-authorized and contemplated, municipally-created monopoly, then the citizens, through their legislature or city council, may seek to change those effects. That is the result of the state action and *Noerr Pennington* exceptions to federal antitrust liability. Based on principles of federalism first announced in *Parker v. Brown,* the state action defense recognizes that state government may properly conclude that the marketplace and free competition is not always the only or best solution to economic dislocation or perceived social needs. Where the state legislature authorizes and contemplates anticompetitive conduct in the deference of its regulatory power to municipalities, the city is free to draw the same conclusion in the face of similar problems without regard to potential antitrust liability. Because the court concludes the Illinois legislature authorized the cities to regulate the taxicab industry and in so authorizing further contemplated the anticompetitive effects that have resulted from the City's ordinance, the court concludes the City is immune from antitrust liability. Further, defendants Yellow and Checker are also immune from antitrust liability under the *Noerr-Pennington* doctrine. Therefore, defendant's motion for summary judgment is granted and plaintiffs' motion is denied.

IT IS SO ORDERED.